UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                        **AFFIDAVIT**

                                                               Crim. No. 16-155(JLL)

                -vs-                                          Hon. Jose L. Linares

                                                               Newark, New Jersey

GUY GENTILE,

                  Defendant.

------------------------------------------------------------------X

COUNTY OF NEW YORK  )
                        ):
STATE OF NEW YORK   )

### AFFIDAVIT OF ADAM FORD IN SUPPORT
### OF GUY GENTILE'S MOTION TO DISMISS

        Adam C. Ford, Esq., being duly sworn, deposes and says the following subject to penalties for perjury:

        1.     I am a principal of the law firm of Ford O'Brien, LLP, attorneys of record for Guy Gentile.

        2.     I have personal knowledge of the matters set forth below, and the exhibits annexed hereto are true and correct copies of the documents described.

        3.     Mr. Gentile retained my then law firm, Kramer Levin Naftalis and Frankel LLP, on July 13, 2012, shortly after he was arrested at Westchester airport by the Customs and Border Control. He was in FBI custody when I was first notified that my firm, and I, were representing him.

4.      I first met Mr. Gentile, the following morning, Saturday, July 14, 2012, while he was in custody of the Federal Bureau of Investigations. He and I were provided with a copy of a criminal complaint that had been filed under seal on June 25, 2012.

5.      After reviewing the complaint and speaking with Mr. Gentile, he indicated that he wished to cooperate with the government if there was a chance that at the conclusion of his cooperation he would not be charged with any felony. He instructed me to communicate this to the Assistant United States Attorney ("AUSA") in charge of the investigation.

6.      On Saturday July 14, 2012, the AUSA and Mr. Gentile entered into an oral cooperation agreement in which my client agreed to provide extraordinary cooperation against not only his alleged co-conspirators, but also against numerous other known and unknown sophisticated individuals involved in a wide array of securities fraud. In exchange, the government agreed that at the end of Mr. Gentile's cooperation, it would consider in good faith, based on the extent and quality of such cooperation, not charging him with a felony, and whether a misdemeanor would be more appropriate. That day, Mr. Gentile signed a proffer agreement and immediately began providing truthful and helpful information.

7.      As a sign of its good faith, the government decided to withdraw the complaint that we had been shown (and which had been filed under seal) first thing Monday morning to permit Mr. Gentile to give the fulsome cooperation to which he agreed.

8.      The government represented to me that on Monday, July 16, 2012, it did withdraw the sealed complaint in a non-public proceeding that was sealed.

9.      Upon being released from federal custody, Mr. Gentile continued cooperating by reaching out to the targets the government identified as being most important to its investigations.

10.     Also as part of the cooperation agreement, the government required that Mr. Gentile "post bail" with the United States Attorney's Office, that Mr. Gentile turn over all of his passports to me (and originally another attorney), and that the passports not be released to Mr. Gentile without pre-approval from the AUSA.

11.     The government instructed Mr. Gentile that he could not travel without pre-authorization, and required that he permit the FBI to confiscate all but one of his lawfully owned guns (other than those registered to his wife). The government also required that he and his parents sign surety bonds and confessions of judgment, which provided that such bonds would be forfeited if Mr. Gentile failed to comply with any of the government's instructions.

12.     On several occasions, Mr. Gentile submitted requests for permission to travel, which were denied, or restricted to accommodate the government's investigation. For example, during the summer of 2013, Mr. Gentile requested permission to travel to Italy to visit his ailing grandmother. The Government originally denied the request, although it eventually permitted him to travel on the express condition that he return within 24 hours of being directed to do so.

13.     Over the course of the two years following his initial arrest, Mr. Gentile provided what the government consistently and, to this day, has described to me as extraordinary cooperation, the likes of which no one in its office has previously encountered.  It was my understanding that Mr. Gentile was having almost daily conversations and meetings with FBI agents and was working on numerous investigations at the same time.

14.     The government has consistently acknowledged up to the present day that it was not just Mr. Gentile's provision of time that made his cooperation so valuable, but the fact that he assumed a leadership role in many of the planning sessions and meetings, so as to provide critical

strategy suggestions, industry knowledge, and operational know-how that neither agents from the FBI nor other governmental agencies possessed.

15.     At all times, Mr. Gentile did exactly as the government instructed him to do and was consistently lauded for cooperating with the government in its investigations of individuals who, as the lead AUSA told me in sum and substance, were not just regular targets but lawyers, people on the SEC's radar for years, and people on U.S. Attorney's radar for years. The government never raised any issue with the truthfulness of Mr. Gentile's cooperation, or suggested that Mr. Gentile failed to provide the type of extensive cooperation that he had promised as his end of the bargain.

16.     By December 2013, Mr. Gentile had successfully concluded his cooperation into investigations involving all of the individuals associated with the conduct alleged in the sealed complaint. Starting in the winter/spring of 2014, the government expanded its requests of Mr. Gentile to cooperate in new matters involving individuals with whom he did not have any prior dealings.  In response, Mr. Gentile began informing the government, through the FBI agents, that he believed he had fulfilled his end of the original bargain and wanted an explicit assurance from the government that he would not be charged with a felony in exchange for his continued cooperation against new targets.  Mr. Gentile continued to cooperate all through the spring and summer of 2014.  However, on account of his desire to no longer cooperate without an assurance of a non-felony disposition, Mr. Gentile refused to sign a third one-year tolling agreement when asked to do so in July 2014.

17.     In August 2014, Mr. Gentile and I had a meeting with the AUSAs assigned to his case, FBI agents, and SEC staff attorneys. During the meeting, Mr. Gentile expressly told the government that he no longer wished to cooperate unless the government assured him that he

would not be charged with a felony at the conclusion of his cooperation. In response, the government told Mr. Gentile that if he stopped cooperating at that time it was more likely that he would be charged with a felony, but if he continued to cooperate, it was more likely that he would not be charged as such because he would be able to put forth a "better presentation" in support of a non-felony resolution.

18.     At the conclusion of that meeting, Mr. Gentile agreed to continue cooperating even though he received only encouragement, and not an explicit assurance, that he would receive a non-felony disposition, as the government told him it would be better if continued to cooperate. Nonetheless, Mr. Gentile, despite having already signed two prior one-year tolling agreements, refused to sign a third. During the August 2014 meeting, I told everyone present that Mr. Gentile was refusing to sign another tolling agreement because, in sum and substance, he wanted to make sure that everything was over by June 30, 2015. My statement referenced the fact that the government knew and understood that even if Mr. Gentile did not sign the tolling agreement they were requesting him to sign, the government still had eleven months to charge him per the terms of the tolling agreements, and the applicable five-year statute of limitations. No one at that meeting indicated that the government believed it would have two additional years to file an indictment because it believed the statute of limitations was six years. All of the tolling agreements were drafted by the government.

19.     During the fall of 2014, I had several conversations with the AUSA in charge of the investigations during which I conveyed Mr. Gentile's continuing requests for a firm commitment that if he kept cooperating he would not be charged. On more than one occasion, the AUSA suggested that Mr. Gentile should continue to cooperate as it would benefit him. Because Mr. Gentile wanted a more formal assurance, during one of these calls it was decided that it was

5

appropriate for Mr. Gentile to make a written submission detailing his cooperation to date and a formal request for non-prosecution in exchange for his continued cooperation. This submission, a settlement offer, was submitted on October 10, 2014. Mr. Gentile continued to cooperate at the government's direction, after providing the October 10th submission which requested that no charges be brought in exchange for his continued cooperation. The primary focus of Mr. Gentile's cooperation was an investigation that the AUSA told me was very important to the U.S. Attorney's Office as it gave the office visibility into complex securities areas that it did not have access to previously. As a result of this continued cooperation and my client's growing anxiety regarding the extent of the work he was putting into cooperating, including the increase in danger to his health and safety, I had more calls with the AUSA to confirm Mr. Gentile was on track to not be charged at the conclusion of his cooperation.

20. During one telephone conversation, the AUSA told me that the U.S. Attorney's Office was very pleased with all the cooperation Mr. Gentile had provided, and that the one investigation he was working on which involved a Russian national involved in a sophisticated high-frequency trading scheme was of particular importance. The AUSA told me in sum and substance that Mr. Gentile's cooperation in this matter has given the Newark office visibility into a space it has never had before, first-ever criminal case for high-frequency trading, and given the office real time visibility into these high profile areas.

21. As a result, I recall the AUSA telling me that if Mr. Gentile just completed this investigation, he would "get what he wanted." At the time this statement was made, the AUSA understood that Mr. Gentile wanted to not be charged at the conclusion of his cooperation, as that desire was set forth in his October 10, 2014 submission.

22.     Following these conversations, in December 2014, I had a meeting with the government, including the US Attorney. During this meeting, I reiterated that my client did not want to cooperate any further if the office was not going to make a binding commitment that he would not be charged with a felony at the conclusion of his cooperation. I did not raise the AUSA's statement that Mr. Gentile would "get what he wanted" but rather stated, as part of a fundamental fairness argument, that the agents explicitly expressed to Mr. Gentile that he would not be charged, and that the AUSA was more circumspect with his words, sending mixed messages that encouraged Mr. Gentile to continue cooperating. I had concluded that – at that time – the fundamental fairness argument based on the totality of the circumstances and the extent of Mr. Gentile's cooperation was the strongest argument in favor of receiving an official commitment from the U.S. Attorney's Office that Mr. Gentile would not be charged with a felony in exchange for his cooperation.

23.     The government told me that they would take our settlement proposal under advisement.

24.     Shortly after the December 2014 meeting, the FBI agents called Mr. Gentile and demanded that he continue to cooperate with the government. Mr. Gentile continued to cooperate in the high-frequency trading matter until the target was arrested and indicted, and then continued to cooperate through the summer of 2015.

25.     Mr. Gentile's life was severely affected by the government continuing to force him to cooperate. On at least two occasions, Mr. Gentile reported to me that threats were made against his life or well-being. These threats were communicated to the government. On both occasions, the government took the threats seriously, and I was told they were being handled appropriately by the FBI agents.

26.     In July 2015, after my client and I believed the statute of limitations expired, the government called my office to tell me that it had decided it was going to indict Mr. Gentile with a felony.

27.     After the government told Mr. Gentile of its decision, I (along with a former law partner) had a meeting with the AUSA in charge of the investigation and another AUSA, during which I voiced my concern that the government would indict Mr. Gentile after the AUSA told me "he would get what he wanted," and after the government continued to use him as a cooperator following my telling the government back in December 2014 that he would no longer cooperate unless he would not be charged.  It was agreed that the intended effect of the AUSA's statements during that call was to inform Mr. Gentile that it would be better for him if he continued to cooperate, rather than stopping his cooperation at that time.  Following this meeting, I had another meeting with the government in September 2015 during which I argued that, all things considered, it was fundamentally unfair to indict Mr. Gentile, particularly given that the government continued to use Mr. Gentile as a cooperator after December 2014, when he said he would no longer cooperate unless he was assured he would not be charged.

28.     Shortly thereafter, in October 2015, I notified the government that Mr. Gentile's right to a speedy trial had been violated and that the statute of limitations had run out on June 30, 2015.

29.     Attached hereto as Exhibit A is a true and correct copy of a Criminal Complaint, Mag. No. 12-6096, filed under seal on June 25, 2012.

30.     Attached hereto as Exhibit B are true and correct copies of letters from Gurbir Grewal dated July 14 and 15, 2012 regarding Guy Gentile's interview by representatives of the U.S. Attorney's Office and the Federal Bureau of Investigation.

31.     Attached hereto as Exhibit C is a true and correct copy of Guy Gentile's Waiver of Right to Speedy Appearance Before a Federal Magistrate signed and dated July 14, 2012.

32.     Attached hereto as Exhibit D is a true and correct copy of the Information charging Adam S. Gottbetter filed September 3, 2014 in the United States District Court for the District of New Jersey.

33.     Attached hereto as Exhibit E is a true and correct copy of the civil complaint filed by the Securities and Exchange Commission against Adam S. Gottbetter, Mitchell G. Adam and K. David Stevenson on May 26, 2015.

34.     Attached hereto as Exhibit F is a true and correct copy of the Affidavit of Guy Gentile detailing a tolling agreement signed August 1, 2012.

35.     Attached hereto as Exhibit G is a true and correct copy of the Affidavit of Guy Gentile detailing a tolling agreement signed July 31, 2013.

36.     Attached hereto as Exhibit H are true and correct copies of a Surety and Appearance Bond and Confession of Judgment executed by Guy Gentile on August 1, 2012.

37.     Attached hereto as Exhibit I are true and correct copies of a Surety and Appearance Bond and Confession of Judgment executed by Giovanni Gentile and Antonietta Gentile on July 31, 2012.

38.     Attached hereto as Exhibit J is a true and correct copy of email correspondence between myself, Guy Gentile and Gurbir Grewal occurring between October 7 and October 15, 2013.

39.     Attached hereto as Exhibit K is a true and correct copy of email correspondence between myself and Gurbir Grewal occurring on October 20, 2013.

40.     Attached hereto as Exhibit L is a true and correct copy of email correspondence between myself, Gurbir Grewal and Nicholas Grippo occurring on December 3, 2013.

41.     Attached hereto as Exhibit M is a true and correct copy of email correspondence between Guy Gentile, Erica Mongelli and Kenneth Rones occurring on September 24, 2012.

42.     Attached hereto as Exhibit N is a true and correct copy of a Report of the Federal Bureau of Investigation's Criminal Justice Information Services Division.

43.     Attached hereto as Exhibit O is a true and correct copy of email correspondence between myself, Guy Gentile and Gurbir Grewal occurring on March 14, 2014.

44.     Attached hereto as Exhibit P is a true and correct copy of email correspondence between myself, Gurbir Grewal and Nicholas Grippo occurring on July 22, 2015.

45.     Attached hereto as Exhibit Q is a true and correct copy of a portion of the deposition testimony of Adam B. Levy, taken on August 26, 2014 (and linked to in the article attached as Exhibit R.)

46.     Attached hereto as Exhibit R is a true and correct copy of email correspondence between myself, Gurbir Grewal and Nicholas Grippo occurring on October 6, 2014.

47.     Attached hereto as Exhibit S is a true and correct copy of email correspondence between myself, Gurbir Grewal and Nicholas Grippo occurring on October 14, 2014, (and a blow up of relevant tweet, not emailed to Grewal or Grippo, but herein for demonstrative purposes)

48.     Attached hereto as Exhibit T is a true and correct copy of email correspondence between myself and Gurbir Grewal occurring on May 28, 2014.

49.     Attached hereto as Exhibit U is a true and correct copy of email correspondence between myself, Guy Gentile and Nicholas Grippo occurring between September 8 and September 9, 2015.

Dated: New York, New York
July 14, 2016

Sworn to before me this
14th day of July, 2016

_____
Notary Public

Chad D. Seigel
Notary Public, State of New York
No. 02SE6288205
Qualified in New York County
Commission Expires 9/3/2017

_____
Adam C. Ford, Esq

11