# Exhibit A

ORIGINAL FILED
JUN 25 2012
WILLIAM T. WALSH, CLERK

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Shipp |
| v. | : | Mag. No. 12-6096 |
| GUY GENTILE | : | CRIMINAL COMPLAINT |
| | : | **FILED UNDER SEAL** |

I, Gregory Yankow, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Gregory Yankow, Special Agent
Federal Bureau of Investigation

Sworn to before me, and
subscribed in my presence

June 25, 2012 at
Newark, New Jersey

HONORABLE MICHAEL A. SHIPP
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

### Count One
### (Wire Fraud Conspiracy)

From at least as early as in or about April 2007 through in or about June 2008, in the District of New Jersey and elsewhere, defendant

### GUY GENTILE

did knowingly and intentionally conspire and agree with others, to execute a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing this scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Gregory Yankow, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have knowledge of the facts contained in this affidavit based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and the review of documents and records. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

### A.  Relevant Parties and Entities

At all times relevant to this Complaint, unless otherwise indicated:

1. Defendant GUY GENTILE resided in Mahopac, New York, and was the founder and owner of Stock USA Execution Services, Inc. ("Stock USA"), a registered broker-dealer located in Carmel, New York.

2. Coconspirator #1 ("CC #1"), who is named as a coconspirator but not as a defendant herein, was a resident of Toronto, Ontario, Canada. CC #1 had worked as a stockbroker in Canada in the 1990s, and from approximately 2005 through approximately 2009, Coconspirator #1 operated a penny stock promotion business in Canada.[1]

3. Coconspirator #2 ("CC #2"), who is named as a coconspirator but not as a defendant herein, was a resident of Toronto, Ontario, Canada, and a partner in CC #1's penny stock promotion business in Canada.

4. Coconspirator #3 ("CC #3"), who is named as a coconspirator but not as a defendant herein, was a resident of Holmdel, New Jersey, and a penny stock promoter.

5. Raven Gold Corporation ("RVNG") was a Nevada corporation, whose headquarters were in Vancouver and Penticton, British Columbia, and its common stock was quoted on the OTC Bulletin Board ("OTCBB") and was a "penny stock." Although traded on the OTCBB, RVNG was controlled by two Canadian citizens – "H.M." and "D.H." (collectively the "RVNG Owners").

6. Kentucky USA Energy, Inc. ("KYUS") was a Delaware corporation headquartered in London, Kentucky, which purported to be engaged in shale gas exploration in western Kentucky. During the scheme alleged herein, its common stock was quoted on the OTCBB and was a "penny stock."

---

[1] The term "penny stocks" refers to publicly-traded companies with low share prices. "Penny stock promoters" typically engage in the coordinated manipulation of penny stock prices in exchange for shares or other financial compensation from company management or another owner of the targeted penny stock.

7.  Knight Equity Markets L.P. ("Knight"), located in Jersey City, New Jersey, was a registered broker-dealer that operated as a market maker[2] in equity securities, including those traded on the OTCBB. At all times relevant to this Complaint, Knight maintained computer servers in Jersey City, New Jersey, and all trades made through Knight were conducted through the New Jersey-based servers.

### B.  The Scheme to Defraud

8.  From at least as early as in or about April 2007 through in or about June 2008, GENTILE and his coconspirators engaged in an extensive "pump-and-dump" fraud scheme, i.e., a scheme to fraudulently inflate the share prices of, among others, RVNG and KYUS stock, in order to later sell those shares at an artificially inflated price. As part of the scheme, GENTILE and his coconspirators first obtained control of large blocks of the free trading shares of RVNG and KYUS. Next, GENTILE and his coconspirators "pumped" the price of those shares by, among other things: (a) disseminating misleading promotional materials touting the stocks and encouraging others to purchase them; and (b) engaging in manipulative trading of the stocks. After pumping the stocks, GENTILE and his coconspirators "dumped" them; that is, they sold large volumes of the RVNG and KYUS shares that they owned and controlled to victim-investors. Following the dump, the price of RVNG and KYUS stock fell, and victim-investors suffered a loss. The scheme to defraud was executed, at least in part, using market makers located in the District of New Jersey, including, among others, Knight, and generated approximately $17.2 million in illegal proceeds.

### C.  The RVNG Pump and Dump Scheme

9.  In or about April 2007, the RVNG Owners solicited CC #1 and CC #2 to promote the stock of RVNG as part of a pump and dump scheme. CC #1 and CC #2 agreed to do so, and recruited GENTILE to execute the scheme. Between in or about May 2007 and in or about July 2007, the RVNG Owners caused large blocks of unrestricted RVNG shares to be delivered to brokerage accounts controlled by CC #1, CC #2, and GENTILE. Ultimately, CC #1, CC #2, and GENTILE each received approximately 10 million unrestricted RVNG shares, which constituted approximately 30% of RVNG's total unrestricted stock.

---

[2] A "market maker" is a broker-dealer firm that holds shares of a particular security to facilitate trading in that security. Market-makers, such as Knight, electronically display buy and sell quotations for a guaranteed number of shares to their customers. For example, when a market-maker receives an order, it immediately fulfills that order from its own inventory, or seeks an offsetting order. This entire process is automated and trades are executed within seconds.

2

*Manipulative Trading*

10. Upon receiving the RVNG shares, GENTILE began engaging in a pattern of manipulative trading designed to create the appearance of liquidity and market depth for RVNG. For example, GENTILE engaged in trades for RVNG in which he or others acting in concert with him were on both the "buy" and "sell" side of the same trades. These trades were purely designed to show that there was market interest in RVNG. In fact, throughout June 2007, GENTILE's trading in various brokerage accounts that he controlled accounted for a substantial portion of RVNG's daily volume.

11. In other cases, GENTILE created market interest in RVNG by transferring blocks of unrestricted RVNG to individuals acting in concert with him to induce them to purchase additional RVNG shares during the promotion, and thereby further the artificial appearance of interest in RVNG. For example, between on or about June 28, 2007, and on or about July 2, 2007, GENTILE caused approximately 10,000 RVNG shares to be transferred to CC #3 in New Jersey. As a result, CC #3 purchased an additional 10,000 RVNG shares on or about June 29, 2007.

*The RVNG Promotional Mailer*

12. The centerpiece of the RVNG pump and dump was an eight-page, glossy promotional mailer (the "RVNG Mailer") as well as media advertisements (the "RVNG Advertisements") that were widely disseminated in mid-July 2007. Based on my review of bank records, telephone records, and interviews with witnesses, I believe that GENTILE was primarily responsible for coordinating the design (including content), printing, and dissemination of the RVNG Mailer and the RVNG Advertisements. Among other things, telephone records reveal that during the relevant time period GENTILE was in frequent communication with a coconspirator in Hawaii who designed the mailer, and a coconspirator in Nebraska, who was responsible for, among other things, purchasing the RVNG Advertisements, and a firm in Canada that was responsible for distributing the RVNG Mailer. In addition, my review of bank records has revealed that GENTILE caused approximately $1.5 million to be wired from accounts that he controlled to various entities in furtherance of the RVNG Mailer.

13. The RVNG Mailer was materially false in numerous ways. For example, it was misleadingly titled "Stock Trend Report" and claimed to be a July 2007 "Special Edition of Premium Members." In reality, Stock Trend Report was a fictional name that GENTILE and his coconspirators created specifically for the RVNG promotion. It also claimed that the RVNG stock had been "seen on" CNBC and Bloomberg, as well as in the Wall Street Journal, New York Times, and other publications. This statement was materially misleading because it created the false impression that RVNG was a subject of reporting in those publications, and failed to disclose that in reality the stock was only "seen" in paid advertisements placed by GENTILE. In addition, the RVNG Mailer touted RVNG's "strong move upward" in "recent weeks," which the mailer attributed to the company's strong business prospects, and contained a chart covering the

3

time period from early May to mid-June 2007 and purportedly showed the stock's "remarkable uptrend so far." These statements were materially misleading because the RVNG Mailer failed to disclose that a substantial portion of the market activity reflected in the chart was GENTILE's trading, which was executed, at least in part, in order to create the chart for the mailer.

14. Also in or about mid-July 2007, GENTILE caused the RVNG Advertisements to be placed in multiple publications, including the New York Times, Investor's Business Daily, CNBC and Barron's. GENTILE paid approximately $370,000 for the RVNG Advertisements, which were, in substance, versions of the mailer, and contained many of the same materially false and misleading statements discussed above.

### Press Releases

15. Throughout June 2007 and July 2007, the RVNG Owners supported the RVNG promotion with a steady stream of press releases, including a number that were issued at GENTILE's request to generate newsworthy events to help stimulate the RVNG share price during the promotion. In total, RVNG issued 13 press releases during this time period: five in June and eight in July. Of those, five announced purported arrivals of new officers and directors, and the remaining eight touted purported developments in RVNG's exploration business.

### The Effect of the RVNG Promotion and GENTILE's Illegal Proceeds

16. Prior to the promotion, RVNG was thinly traded and its share price did not exceed $0.80 per share. Indeed, on many days it was not traded at all. Beginning on or about May 31, 2007 (the date that GENTILE received his initial block of RVNG shares) and continuing through July 2007 (the period of GENTILE's promotional activities), the stock's daily price and volume went up substantially. Following the promotion, share price and volume dropped equally dramatically. The following table illustrates the effect of GENTILE and his coconspirators' manipulative conduct:

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| 3/6/07 – 5/30/07 | 40,372 | $0.61 | $0.85 | $0.72376 |
| 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

17. Between in or about May 2007 and in or about April 2008, GENTILE sold, or "dumped" approximately 5.7 million RVNG shares for total proceeds of approximately $6.8 million.

4

## The KYUS Pump and Dump Scheme

18. Following the successful RVNG promotion, GENTILE, CC #1 and CC #2 participated in a pump and dump involving KYUS stock. Specifically, GENTILE offered CC #1 and CC #2 half of any profits he earned from his promotion of KYUS, in exchange for $300,000, which GENTILE claimed he would use to partially finance the promotion.

19. In or about October 2007, CC #1 and CC #2 wired approximately $300,000 to GENTILE's bank accounts. In addition, between in or about September 2007 and in or about October 2007, CC #3 and a New York-based attorney (the "New York Attorney") also contributed approximately $100,000 each to the scheme.

20. In or about November 2007, KYUS had approximately 36 million common shares issued and outstanding: 24 million restricted shares and 12 million unrestricted shares. Through a series of transfers in or about November 2007, GENTILE, CC #3, and the New York Attorney acquired nearly all of the 12 million unrestricted KYUS shares, with GENTILE controlling approximately 9 million of them, CC #3 controlling approximately 1.375 million, and the New York Attorney controlling approximately 1.5 million.

21. Thereafter, GENTILE and his coconspirators embarked on a promotional campaign designed to manipulate the price of KYUS. As with the RVNG promotion, the KYUS promotion involved manipulative trading by GENTILE and others, as well as a promotional mailer.

### *Manipulative Trading*

22. For a five month-period beginning on or about November 20, 2007, GENTILE and his coconspirators began to actively trade KYUS stock in accounts they controlled. As in the RVNG scheme, GENTILE and his coconspirators intended to create the appearance of liquidity and active market interest in the stock, and to build an attractive price and volume history through their trading. On many days during this period, GENTILE's trading accounted for most of the reported volume in the stock, and many of GENTILE's trades during this period were, in substance, trades with himself. During this period, GENTILE routed "buy" and "sell" orders for the same account through various market makers, including market makers located in New Jersey. For example, at approximately 9:56 a.m. on November 20, 2007, GENTILE placed a sell order for 1,500 KYUS shares at $0.60 per share through Knight, which was routed through Knight's computer servers in New Jersey. Thereafter, he also placed a buy order through KNIGHT for 1,500 KYUS shares at $0.60 per share, which was also routed through Knight's computer servers in New Jersey.

23. In or about early May 2008, GENTILE instructed CC #1 to further assist in the scheme by placing trades in KYUS. To that end, CC #1 placed a number of manipulative trades at GENTILE's request using overseas trading accounts. Among other things, in or about May

5

2008, CC #1 placed and canceled a series of successively higher "buy" orders for KYUS at different brokers in order to maximize the appearance of liquidity, depth and interest in the stock, and to "walk up" the price of KYUS.

### The KYUS Promotional Mailer

24. The second aspect of the KYUS pump and dump was a promotional mailer (the "KYUS Mailer"), which was distributed in or about May 2008. GENTILE coordinated the design (including content), printing, and dissemination of the KYUS Mailer.

25. The KYUS Mailer was materially false and misleading in numerous ways. For example, it was misleadingly titled "Global Investor Watch" (or "GIW") and claimed to be a Spring 2008 "Special Edition of Premium Members." In reality, Global Investor Watch was a fictional name that GENTILE and his coconspirators created specifically for the KYUS promotion. In addition, it contained a KYUS price chart covering the time period from early November 2007 through approximately March 2008, and was titled "KYUS on the Move." The chart and headline were materially misleading in that most of the KYUS market activity reflected in the chart was the result of GENTILE's manipulative trading, which was done, at least in part, to create the chart in the KYUS Mailer. Finally, it contained a disclaimer which, among other things, falsely stated that:

> GIW has been compensated by Green Century Capital with cash in the amount of $2,398,485.50. GIW has been compensated for dissemination of this advertisement and other professional services. GIW's affiliates, officers, directors and employees may also have bought or may buy the shares discussed in this opinion and may profit in the event of a rise in value.

In reality, GENTILE was behind the advertisement, and his compensation was not cash, but rather 75% of KYUS unrestricted stock.

### The Effect of the KYUS Promotion and GENTILE's Illegal Proceeds

26. As a result of the KYUS promotion described above, GENTILE and his coconspirators manipulated the stock price of KYUS from $0.69 in November 2007 to a high of $3.97 on May 23, 2008, with trading volume exceeding 4.4 million shares on that date.

6

Following the dump phase of the scheme, the stock price and the volume decreased dramatically ($2 in mid-July and below $1 on October 1, 2008). The following table illustrates the effect of GENTILE and his coconspirators' manipulative conduct:

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| 11/20/07 – 5/1/08 | 19,609 | $0.60 | $1.69 | $1.25672 |
| 5/2/08 – 5/31/08 | 1,562,697 | $1.65 | $3.97 | $2.51975 |
| 6/1/08 – 7/31/08 | 194,626 | $1.60 | $2.42 | $2.02791 |
| 8/1/08 – 12/31/08 | 26,895 | $0.55 | $1.82 | $0.97212 |

27. Between in or about November 2007 and in or about May 2008, GENTILE sold, or "dumped" approximately 4.4 million of his 9 million KYUS shares for total illegal proceeds of approximately $10.7 million. In late May 2008, GENTILE wired approximately $2.5 million of his illegal proceeds to individuals at KYUS. Between late May and early June of 2008, GENTILE also wired a total of approximately $2.4 million to CC #1 and CC #2 – their share of the profits from the KYUS pump and dump.