# Exhibit E

Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                 Plaintiff,               :     15 Civ.        (     )
                                          :
           -against-                      :     COMPLAINT
                                          :
ADAM S. GOTTBETTER, MITCHELL G. ADAM,     :
and K. DAVID STEVENSON,                   :
                                          :
                 Defendants.              :
-----------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Adam S. Gottbetter ("Gottbetter") (who, upon information and belief, currently resides at 147 Coconut Palm Road, Boca Raton, Florida 33432), Mitchell G. Adam ("Adam") (who, upon information and belief, currently resides at 3858 W. 24th Ave., Vancouver, British Columbia, Canada), and K. David Stevenson ("Stevenson") (who, upon information and belief, currently resides at 11 Ocean Point, West Vancouver, British Columbia, Canada), alleges:

## SUMMARY

1. This case involves three schemes to inflate the stock price of three separate publicly traded securities. Each of the schemes was devised and orchestrated by Gottbetter, a well-known New York micro-cap securities and transactional lawyer.

2. In all three, Gottbetter played the central role of architect and facilitator, using his law office as the headquarters for the planning and implementation of the schemes. In all three, Gottbetter arranged the purchase of public company shells by business partners and their nominees; arranged for the shell's acquisition of private operating companies; recruited "traders" to engage in manipulative matched trades to inflate the stock price; and planned or approved promotional campaigns that touted the public companies' prospects to entice innocent investors to buy the stock at inflated prices. Gottbetter and his partners planned to pump the companies' stock prices and then sell the shares they controlled, reaping massive profits.

3. In the first scheme, launched in 2007, Gottbetter realized his goal through the manipulation of the stock of Kentucky USA Energy, Inc. ("KYUS"), a company involved in natural gas production. In the KYUS scheme, Gottbetter recruited a stock promoter and trader (the "Trader") to design and implement a promotional campaign and to engage in a series of matched trades, all designed to inflate the stock price of KYUS. The KYUS scheme generated approximately $12 million in gross proceeds for the scheme participants.

4. In the second scheme, in the spring of 2013, Gottbetter recruited the Trader to come out of retirement to engage in the same manipulative trading and promotional activities as he had executed in the KYUS scheme, this time to inflate the stock price of Dynastar Holdings, Inc. ("DYNA"), a company that holds itself out as a social media and direct marketing business. Although the Trader began his manipulative trading in June 2013, Gottbetter put that scheme on

hold, in part because Gottbetter had been approached by Adam and Stevenson with an even bigger – and potentially more lucrative – scheme.

5.   In July 2013, Adam and Stevenson, veteran stock promoters with connections in the United States, Canada and Europe, approached Gottbetter to put together the most ambitious of the three schemes. In a series of telephone calls and meetings beginning in late July 2013, Gottbetter, Adam and Stevenson hatched their plan to drive up the price of the common stock of HBP Energy Corp. ("HBPE") – a company purportedly intended to engage in oil drilling and extraction – through pre-arranged matched trades and an extensive promotional campaign, all with the ultimate goal of dumping their own shares on unsuspecting investors at the inflated prices. Gottbetter, Adam and Stevenson recruited the Trader to manipulate the stock price – specifically, to "walk up" the stock price and reported market volume and to create the false appearance of liquidity and investor interest in the stock.

6.   In October 2013, Adam and Stevenson executed the first open-market trades in the HBPE manipulation scheme, including a series of matched trades between accounts they controlled.

7.   Throughout the planning of the DYNA and HBPE schemes, Gottbetter knew that the schemes were unlawful. In plotting the HBPE scheme, Gottbetter, Adam and Stevenson repeatedly warned each other of the dangers of missteps that might draw the attention of regulators and the importance of keeping Adam's and Stevenson's identities secret. The three even rehearsed the stories they would tell if questioned by law enforcement. In a meeting on September 11, 2013, Gottbetter complained about the complexities of the stock manipulation business, but conceded that the only other way he could think of to create so much "liquidity" – that is, cash – so quickly was "robbing a bank."

8.     By orchestrating and engaging in the KYUS scheme, Gottbetter violated the securities registration and the anti-fraud provisions of the Securities Act of 1933 ("Securities Act"), and by engaging in the KYUS, DYNA and HBPE schemes, Gottbetter violated or aided and abetted violations of the anti-fraud provisions of the Securities Exchange Act of 1934 ("Exchange Act"). By orchestrating and engaging in the HBPE scheme, Adam and Stevenson each violated or aided and abetted violations of the anti-fraud provisions of the Exchange Act.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

9.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d)(1) and 21(d)(5) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(5), seeking a final judgment: (a) permanently restraining and enjoining each Defendant from engaging in the acts, practices and courses of business alleged herein; (b) prohibiting each Defendant from participating in any offering of penny stock pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6) and, as to Gottbetter, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g); (c) requiring each Defendant to disgorge ill-gotten gains and to pay prejudgment interest thereon; and (d) imposing civil money penalties on each Defendant pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) and, as to Gottbetter, pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

11. Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Some of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the District of New Jersey. For example, the sales of unregistered KYUS securities, and the manipulative trades that the Trader placed as part of the DYNA scheme were executed or cleared, in part, through broker-dealers located in the District of New Jersey. Additionally, the Trader's purchase of a block of HBPE stock from accounts controlled by Adam and Stevenson was made through wire transfers that originated from the District of New Jersey, and the HBPE stock certificate issued to the Trader's nominee as a result of that purchase was mailed to the nominee's address in the District of New Jersey.

12. Each of Gottbetter, Adam and Stevenson, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

13. **Gottbetter**, age 47, currently resides in Palm Beach County, Florida, but, during the manipulation schemes alleged herein, resided in New York, New York. Gottbetter is a licensed attorney and, at all relevant times, owned a law firm and a broker-dealer registered with the Commission.

14. **Adam**, age 47, resides in Vancouver, Canada, and is a Canadian citizen.

15. **Stevenson**, age 55, resides in Vancouver, Canada, and is a Canadian citizen. During all times relevant here, Stevenson resided in London, United Kingdom.

## ISSUERS

16. **KYUS** was a Delaware corporation headquartered in London, Kentucky. From approximately May 2008 and until its 2010 bankruptcy filing, KYUS held itself out as a business engaged in shale gas exploration in western Kentucky. During the manipulation scheme alleged herein, its common stock was quoted on the OTCBB and was a penny stock as defined under Exchange Act Rule 3a51-1.

17. **DYNA** was a Nevada corporation with headquarters in Louisville, Kentucky. During the manipulation scheme alleged herein, DYNA held itself out as a social media and direct marketing business. At all relevant times, DYNA's common stock was quoted on OTC Link (formerly, "Pink Sheets"), operated by the OTC Markets Group, Inc., under the symbol DYNA and was a penny stock as defined under Exchange Act Rule 3a51-1.

18. **HBPE**, formerly Lido International, Corp., was a Nevada-incorporated development stage company. Although HBPE's public filings described it as engaged in "the consulting business in commercial cultivation of champignon mushrooms," its Form 8-K filed with the Commission on September 5, 2013, announced that it had changed its name to HBP Energy Corp., and that it was engaged in discussions about a possible business combination with a private corporation engaged in oil exploration and extraction, Firebird Petroleum, Inc. about a possible business combination. During the relevant time, HBPE's common stock was quoted on OTC Link, operated by the OTC Markets Group Inc., under its old symbol LIDO and was a penny stock as defined under Exchange Act Rule 3a51-1.

## FACTS

### I. The KYUS SCHEME

#### A. KYUS Corporate Background

19. KYUS was incorporated in Delaware in or about September 2006, under the name Las Rocas Mining Corp. ("Las Rocas"). In its public filings, the company claimed that its "principal business plan was to acquire, explore and develop mineral properties and to ultimately seek earnings by exploiting the mineral claims." In fact, the company was a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives (together, "KYUS Shell Sellers").

20. In March 2007, the company filed with the Commission Form SB-2, a registration statement covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000. The registration statement became effective in or about June 2007. The one million shares covered by the registration statement were sold in or about June 2007 to friends and acquaintances of the KYUS Shell Sellers. These friends and acquaintances were mere nominees of the KYUS Shell Sellers, and at all relevant times, the KYUS Shell Sellers retained control over the shares.

21. After the purported public offering, the company had three million common shares issued and outstanding: two million restricted shares, previously issued to Las Rocas's sole officer and director, and one million purportedly unrestricted shares distributed in the June 2007 offering and controlled by the KYUS Shell Sellers.

22. As alleged in greater detail below, on or about October 15, 2007, Gottbetter arranged the purchase of the shell from the KYUS Shell Sellers for approximately $760,000 contributed by Gottbetter, the Trader, the Trader's partners, two promoters based in Ontario,

Canada ("the Trader's Partners"), and Gottbetter's business partner ("Gottbetter's Partner") (together, the "Gottbetter KYUS Group").

23. Shortly thereafter, on or about October 26, 2007, Las Rocas announced that it had changed its name to Kentucky USA Energy, Inc., and that it was in merger discussions with a private company called KY USA Energy, Inc. ("Privco"); the merger ultimately closed on May 2, 2008.

24. In late November 2007, and pre-merger, the newly renamed KYUS effected a 12:1 stock split, after which the company had 36 million shares issued and outstanding: 24 million restricted shares held by its purported founder and 12 million purportedly unrestricted shares that, as a result of the shell purchase described in detail below, were controlled by the Gottbetter KYUS Group.

25. Between the sale of the shell in October 2007 to the Gottbetter KYUS Group, and the closing of the KYUS merger with Privco on May 2, 2008, KYUS was a shell company under the federal securities laws. The company during this time period had no non-cash assets and no or nominal operations, and it had abandoned its stated initial business plan and was exploring a possible merger. In some of its public filings during this time period, KYUS expressly stated that it was a shell company.

**B. Gottbetter's KYUS Stock Promotion Deal**

26. In or about the summer of 2007, Gottbetter and Gottbetter's Partner met the Trader through a common acquaintance. Soon thereafter, Gottbetter and Gottbetter's Partner invited the Trader to participate in the KYUS manipulation scheme.

27. Over the course of several meetings and conversations that occurred in the following weeks and months, Gottbetter, Gottbetter's Partner, and the Trader agreed that the

Trader, working with the Trader's Partners, would: (1) "build the chart" for the KYUS stock – that is, create seemingly attractive price and volume history for the stock by means of manipulative trading; (2) distribute a promotional mailer touting the stock, including its seemingly favorable price and volume history; and (3) fund the promotional mailing with proceeds from selling KYUS stock in the open market. The three also agreed that, for the purpose of perpetrating this scheme, Gottbetter would arrange for the Trader and the Trader's Partners to obtain control of a substantial block of purportedly unrestricted KYUS stock.

28.    Gottbetter arranged for the purchase of the shell from the KYUS Shell Sellers for $760,000 on or about October 15, 2007. To execute the shell purchase, Gottbetter arranged for a transfer of all the purportedly unrestricted shell shares from the various nominees of the KYUS Shell Sellers to himself, Gottbetter's Partner, the Trader and the Trader's Partners, in exchange for a payment of $760,000 that the KYUS Shell Sellers then split among themselves.

29.    The funds for the shell purchase – $760,000 for payment to the KYUS Shell Sellers and an additional $46,000 for various fees to Gottbetter's law firm and brokerage firm – came from the Trader, who contributed $304,000; the Trader's Partners, who together contributed $300,000; and Gottbetter and Gottbetter's Partner, who contributed $101,000 each. In return, the Trader received for himself and the Trader's Partners 75% of the purportedly unrestricted KYUS stock. The remaining 25% of the purportedly unrestricted stock was split equally between Gottbetter and Gottbetter's Partner.

30.    To conceal their identities and involvement in the planned manipulation, in purchasing the shell stock, the Trader and the Trader's Partners acted not in their own names but in the names of one domestic and three offshore brokerage firms where they had membership interests or accounts (collectively, the "Nominee Entities"). All the stock purchase agreements,

prepared by Gottbetter's law firm at his direction, were executed by representatives of the Nominee Entities; the funds for the stock purchases were wired from the Nominee Entities' accounts, into an escrow account maintained by Gottbetter's law firm; and, once the stock was purchased, the shares were deposited in the Nominee Entities' U.S. brokerage accounts at Gottbetter's law firm's direction.

31. Gottbetter knew or was reckless in not knowing that the four Nominee Entities were mere fronts used to conceal the promoters' identities, and that the true purchasers of the stock were the Trader and the Trader's Partners.

C. **Manipulative Trading and Fraudulent Promotion of KYUS Stock**

32. Immediately after receiving their KYUS shares into the Nominee Entities' accounts in late 2007, the Trader and one of the Trader's Partners ("Promoter A") began "building the chart" for KYUS stock, in preparation for the distribution of the promotional mailer and the ultimate sell-off that they executed in May 2008, after the promotion inflated the stock's price. The Trader and the Trader's Partners controlled 75% of the public float, and on many days between late 2007 and May 2008, most and sometimes even all of the market activity in the stock was in accounts that the Trader and the Trader's Partners controlled.

33. Among other things, the Trader executed matched trades between the Nominee Entities' accounts and accounts in the names of the Trader's friends and family members that the Trader controlled. The Trader also asked some of his acquaintances among penny stock traders to buy KYUS stock in the open market (in substance, from the Trader), based on the understanding that the Trader would be promoting the stock and would give his "buyers" a heads-up about the upcoming promotion, enabling them to sell the stock at a high price.

34. The matched trades and the efforts to "bring in buyers" described above had the same twin goals. First, by liquidating some of their KYUS holdings, the Trader and the Trader's Partners generated the cash that they would later use to fund the KYUS promotional mailing, in accordance with the Trader's agreement with Gottbetter and Gottbetter's Partner. Second, through these actions, the Trader and Promoter A were delivering on the Trader's promise to Gottbetter to "build the chart" for the KYUS stock, by creating the false appearance of broad market demand and gradually inflating the price.

35. During the "chart-building" phase of the manipulation, Gottbetter knew or was reckless in not knowing that the Trader and Promoter A were engaging in manipulative trading in the KYUS stock, in accordance with the Trader's agreement with Gottbetter.

36. In or about May 2008, shortly after the KYUS merger closed, and in accordance with his agreement with Gottbetter, the Trader worked with the Trader's Partners to create and distribute by mail a glossy promotional mailer touting KYUS. The promotional mailer took the form of an eight-page "newsletter" distributed under the fake name Global Investor Watch. The mailer touted KYUS stock's seemingly attractive – but contrived – recent stock price history and claimed, falsely, that it had been funded by a $2.4 million payment from a fictional entity called Green Century Capital. In fact, the Trader funded the KYUS mailer with proceeds from selling KYUS stock, as he had promised Gottbetter.

37. Gottbetter knew or was reckless in not knowing that the Trader was distributing the KYUS mailer and that the KYUS mailer contained materially false or misleading statements, as alleged above.

38. The manipulation and fraudulent promotion of KYUS stock were successful. Between late 2007, when the scheme began, and May 2, 2008, the day of the KYUS merger, the

stock price rose from $0.69 per share to $1.70 per share. Once the mailer had been disseminated, the stock price soared in May 2008, reaching $3.97 on May 23, 2008. The volume also increased dramatically. While on all but one day before May 9, 2008, daily trading volume was below 100,000 shares, on each day between May 14 and June 2, 2008, the daily trading volume was over one million shares, and it reached a high of over 4.4 million shares on May 23, 2008.

39. By the end of May 2008, the Trader and the Trader's Partners had sold approximately 4.4 million shares of the purportedly unrestricted KYUS shares that they had received into the Nominee Entities' accounts in late 2007, for gross proceeds of approximately $10.2 million. They used a portion of these proceeds to fund the printing and distribution of the KYUS mailer, and they shared the remaining proceeds with the issuer and Gottbetter, as alleged in greater detail in Part D below.

40. Gottbetter and Gottbetter's Partner, for their part, also sold substantial portions of their KYUS stock holdings both during the promotion and thereafter. Gottbetter continued selling KYUS stock through November 2010, and sold virtually all the 1.5 million shares he had received, for gross proceeds of approximately $876,000. Gottbetter's Partner continued selling KYUS stock at least through November 2009, and sold over one million shares, for gross proceeds of over $1.1 million. Gottbetter and Gottbetter's Partner sold their KYUS stock holdings in whole or in part through offshore accounts.

41. Because Gottbetter, Gottbetter's Partner, the Trader and the Trader's Partners had obtained KYUS stock from the persons controlling the issuer, with a view to selling it to the public, Gottbetter, Gottbetter's Partner, the Trader and the Trader's Partners were statutory underwriters under the Securities Act.

42. No registration statement was filed or in effect with respect to the KYUS stock sales of Gottbetter, Gottbetter's Partner, the Trader or the Trader's Partners.

### D. Gottbetter-Orchestrated Sham "Note" Sale

43. In late May 2008, Gottbetter and Gottbetter's Partner were struggling to find financing sources for KYUS, which had substantial short-term loan obligations. In order to avert KYUS's default on those obligations, Gottbetter and Gottbetter's Partner convinced the Trader to funnel to the issuer $2.5 million of his and the Trader's Partners' KYUS stock sale proceeds. At Gottbetter's suggestion and direction, the transfer was disguised as a financing transaction between one of the offshore Nominee Entities and KYUS, by which KYUS purported to sell a note to the Nominee Entity. The transfer of funds from the Trader's Nominee Entity account purported to be the proceeds of that note sale. The note was never repaid.

44. Of the $2.5 million of the "note" proceeds, KYUS paid out over $500,000 to Gottbetter's law firm and brokerage firm for purported fees related to the transaction.

45. Gottbetter knew or was reckless in not knowing that the $2.5 million "note" was a mere front for funneling proceeds of unregistered KYUS stock sales from the Trader and the Trader's Partners to the issuer and to Gottbetter. In fact, in a later conversation in connection with the HBPE scheme, Gottbetter reminded the Trader that the "note" had been the vehicle they had used to disguise the transfer of the KYUS scheme's profits from the Trader to the issuer.

46. The sham "note" transaction improved KYUS's financial condition, helping the company avoid default on its loan obligations. As result, in June 2008, Gottbetter's Partner secured a revolving credit line for KYUS from an unaffiliated hedge fund, and Gottbetter was able to sell a substantial portion of his own allotment of KYUS stock in June and July 2008, at still-inflated prices.

### E. Gottbetter's Role in Concealing the KYUS Scheme From the Investing Public and the Commission

47. At the height of the manipulation and in its immediate aftermath, Gottbetter, in his dual role as one of the scheme participants and counsel for the issuer, went to great lengths to conceal his own and the Trader's involvement in the KYUS stock promotion, both from the investing public and from the Commission.

48. For example, on or about May 30, 2008, Gottbetter, acting as counsel for KYUS, drafted and arranged for KYUS to file with the Commission a Form 8-K asserting that KYUS had no connection to the KYUS mailer. Specifically, the Form 8-K stated that KYUS had "no relationship with Global Investor Watch [the fake name under which the KYUS Mailer was distributed], Green Century Capital [the fake entity that purportedly commissioned the KYUS Mailer], or anyone else affiliated with Global Investor Watch, or its publications, past or present, and [had] not engaged Global Investor Watch, Green Century Capital, or any other person or entity to prepare such brochures."

49. Gottbetter knew or was reckless in not knowing that the 8-K was materially false or misleading. As alleged above, Gottbetter had himself recruited the Trader to create and distribute the KYUS mailer, and also arranged for the Trader and the Trader's Partners to receive 75% of KYUS's purportedly unrestricted shares, in part as compensation for creating and distributing the KYUS mailer.

50. On July 2, 2008, in response to a Commission request for information about the KYUS mailer, Gottbetter, again as counsel for KYUS, assured the Commission staff in a letter that there had been no undisclosed payments to any individual or entity for stock promotion services. Gottbetter knew that that representation was false or misleading because he himself had arranged for the transfer of pre-pump KYUS shares to the Trader and the Trader's Partners