UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                    **AFFIDAVIT**

                                                    Crim. No. 16-155(JLL)
          -vs-                                Hon. Jose L. Linares
                                                    Newark, New Jersey

GUY GENTILE,

                  Defendant.

-------------------------------------------------------------------X

COUNTY OF MIAMI DADE )
                    )ss:
STATE OF FLORIDA )

## AFFIDAVIT OF GUY GENTILE
## IN SUPPORT OF HIS MOTION TO DISMISS

I, Guy Gentile, being duly sworn, deposes and says the following under the penalties of perjury:

1. I was arrested on July 13, 2012 by Customs and Border Patrol ("CBP") while seated on a plane at Westchester Airport. The CBP informed me of my rights, handcuffed me, and then handed me over to the FBI who took me into custody. While in custody and riding in a car with the agents, the FBI agents told me they wanted me to cooperate. I replied that I would, but I wanted the charges against me to go away. The agents told me "we can do that."

2. Over the course of that weekend, during which I was detained in a Newark jail, FBI agents informed me that they were mostly interested in my connections with Adam Gottbetter, who they believed continued to be involved in various securities frauds, and they wanted me to cooperate against him.

3.   Prior to speaking with an attorney, I indicated my willingness to cooperate with the government.  The next day, after reviewing a copy of the sealed complaint that had been filed against me, and after speaking to counsel, I agreed to cooperate pursuant to an oral cooperation agreement.  I never agreed that I would plead guilty to any charge related to the allegations in the complaint.  The terms of the agreement were that I would offer substantial cooperation beyond that relating to the alleged co-conspirators of RVNG and KYUS.  I agreed to do that plus lead the government to unknown individuals and broker-dealers involved in illegal penny stock schemes who were not affiliated with me.  My cooperation later morphed so as to also include training FBI agents in how to communicate effectively with targets involved in pump and dump schemes, and giving instructional courses to agents and Assistant United States Attorneys on types of conduct involved in securities fraud that are ordinarily extremely difficult to detect because of the high degree of sophistication involved in these security frauds.  In exchange for this significant cooperation, the government agreed to withdraw the complaint it had filed against me and to potentially not reinstate any felony charges.  The government also agreed not to act on its previous threats to close my businesses, freeze my assets and "investigate" my wife, parents, and siblings.

4.   Over the next three years, I provided what the government has consistently described to me as extraordinary cooperation, the likes of which no one in the United States Attorney's Office for the District of New Jersey had previously encountered.

5.   My cooperation started with my alleged co-conspirators of the KYUS deal, Adam Gottbetter, Samuel DelPresto, Mike Taxon, and Itamar Cohen, some of whom had continued to engage in pump and dump schemes since 2008 up through 2013.  As part of this cooperation, I provided information to the government related to Taxon and Cohen, which aided the

government in charging Gottbetter, DelPresto, Taxon, and Cohen with several felonies (all four of whom pleaded guilty).  It is my understanding that Neither Gottbetter nor DelPresto were charged with conduct related to KYUS.

6.   During the course of this investigation, Gottbetter, a lawyer, consistently told me, during recorded conversations being listened to by the FBI, that neither he nor I committed any crimes or did anything wrong during the KYUS promotion because Gottbetter understood the law and knew how to stay inside of it.  The government then instructed me to work with Gottbetter to devise a new pump and dump scheme involving two other tickers, DYNE and HBPE.  Setting up the scheme involved significant work, including setting up bank and brokerage accounts.  After Gottbetter took sufficient steps in furtherance of this new scheme, the government arrested a co-conspirator, ▮▮▮▮▮▮▮▮▮▮▮, and Gottbetter was charged criminally in connection with the new scheme and well as co-conspirator ▮▮▮▮▮▮▮▮.

7.   Just as significant, however, is that I was told by the FBI agents that both ▮▮▮▮▮ and his associate, ▮▮▮▮▮▮▮▮, having been confronted with concrete evidence of criminally fraudulent conduct obtained on account of my cooperation, began cooperating themselves in two separate investigations that resulted in the indictment of over a dozen individuals charged with securities fraud for their involvement in two $300-million pump and dump schemes.

8.   After my first 12 months of intensive cooperation, the agents began treating me as one of their own.  The agents consistently told me all the work I was doing was to insure I would not be prosecuted.  They permitted me to carry a concealed weapon during meetings, and they told me they believed we would be working together forever.  As a result of this relationship, I began to believe that my cooperation was resulting in my status changing from that of a cooperator who might be charged with a felony to that of an informant that was working with the government.

Indeed, the government explicitly told me as of early 2014 that I was no longer a cooperator but "more like an undercover agent" and instructed me on exactly how to respond to questions from internal affairs while their unit was under investigation for the amount of money it was spending on the investigations we were working on.  Part of their instructions on how to respond were misleading.

9.   Over the next year and a half, I continued to work with the government in investigations into twenty-five potential targets, the majority of whom I had no prior dealings with, including several "high-value targets" one of whose identity the government did not know, but had only heard about on account of his large-scale securities fraud schemes that went undetected.  During a particularly dangerous operation, I was able to get a photograph and fingerprints of the penny stock promoter ███████████████████████  My cooperation led to the shuttering of several broker dealers, as well as stopping several pump and dump schemes prior to any investors being harmed.

10. My cooperation agreement with the DOJ also required me to cooperate with the United States Securities and Exchange Commission.  This cooperation directly led to dozens of individuals being charged not just by the DOJ, but also by the SEC, and the Commission receiving tens of millions of dollars in penalties and disgorgement.  Also the FBI shared my tapes and wiretaps with the SEC, without my written consent.

11. I offered key cooperation necessary to charge my alleged co-conspirators, Mike Taxon and Itamar Cohen, in connection with the Raven Gold Corporation (RVNG) and Kentucky USA Energy (KYUS) stock promotions. The SEC also charged my alleged co-conspirator, attorney Adam Gottbetter, on May 26, 2015

12. I also brought to the attention of the SEC and the DOJ—and provided documentary evidence of—an almost $1 million insider trading scheme involving a former investment bank analyst at J.P. Morgan who was illegally tipping his close friend with confidential information about clients involved in impending mergers and acquisitions of technology companies.  My cooperation resulted in both criminal and civil securities charges being brought against both individuals, Aggarwal and his friend, Bolandian.

13. I trained and assisted an FBI agent with step-by-step instructions regarding how to speak with a target in order to assess whether the target intended to break the law, or was merely being aggressive by attempting to take advantage of legitimate legal loopholes.  I also gave this agent a crash course on financial instruments and tax strategies in preparation for the agent's trip to meet with targets of the investigation.

14. As a result of this training session, the agent was able to infiltrate a securities fraud conspiracy leading to an SEC action filed against Robert Bandfield and Andrew Godfrey. The SEC filed charges against Bandfield and Godfrey for their involvement in managing an offshore business intended to help clients evade U.S. securities laws and tax laws by concealing the ownership of certain microcap stocks as part of a larger money laundering scheme that allowed their clients, totaling more than 100 U.S. citizens and residents, to lauder more than $500 million.

15. All told, my cooperation with the DOJ also directly resulted in the Securities and Exchange Commission already collecting over $12 million in fines and disgorgements with the potential for tens of millions more to come in.

16. As a result of my work, after Gottbetter was indicted in December 2013, in early spring of 2014, the FBI agents working with me began telling me that I would not be charged at the

conclusion of my cooperation.  I have a specific recollection of the agents saying to me things like: They could "make the charges go away" if I cooperated against Gottbetter (on July 13, 2012); they were "not going to let anything happen to [me]" (shortly after February 2014); I was "more like an agent" and "no longer a cooperating witness" (in February 2014); there was no need to charge me given that my testimony was no longer needed (in February 2014); I would "walk" because I "fulfilled [my] agreement with Gurbir" (in February 2014); and, all the work I was doing is so that I would "not be charged" (in 2013 and 2014).

17. In February 2014, I told the agents that I would not sign another tolling agreement because the current one was going to expire in the summer of 2014, and without a third tolling agreement, the Government would only have one year from the expiration of the second tolling agreement in which to file charges against me.  The agents acknowledged that this was the case.

18. In response to what the agents were telling me, by the summer of 2014, I began to make clear both directly during conversations with the agents I had been working with and through statements to the AUSAs that I was no longer interested in further cooperation unless the government explicitly agreed that it would not reinstate its previously withdrawn felony charges. My counsel told me at the time that he and the Assistant United States Attorney had several discussions during which the AUSA was told that I was not interested in further cooperation unless I was not going to be charged at the conclusion, and the AUSA indicated that it was in my best interest to keep cooperating.  The AUSA stated on several occasions, including during a meeting on August 14, 2014, that, while I was more likely to be charged if I stopped cooperating, if I continued my cooperation, I was more likely not to be charged with a felony at its conclusion, because I could then make a "better presentation" as to why I should not be charged with a felony.  The clear implication in my mind was that I had to keep cooperating because if I

stopped I would be charged even though the agents told me I would not be, and given these communications, the government would not charge me with a felony if I kept cooperating as they instructed.

19. As a result of these statements, I believed I had to continue cooperating.  However, because I was concerned the government would try to force me to cooperate indefinitely, I told the government that I was refusing to sign another tolling affidavit because I wanted to be certain that everything was over on June 30, 2015.  The government agreed that I did not have to sign another tolling agreement.

20. It was during this time that I was cooperating with the government in one of its most sophisticated and ultimately high-profile investigations in the office's history.  I had identified and explained to the government that a Russian national was involved in a sophisticated high-speed international stock trading scheme that involved the use of traders from around the world who would buy or sell orders and then quickly cancel them, a scheme known as layering or spoofing.  The activity would artificially raise or lower the stock prices and allow traders to exploit the price moves to make profits on trades.  This individual's scheme was believed to yield as much $600,000 in a day and generated between $1 million and $50 million per month.  Yet, before I explained how the scheme worked, the government did not understand what was fraudulent about the conduct.  During the fall of 2014, the target of the investigation, Alex Milrud, and I traveled to the Bahamas on several occasions to visit my brokerage firm, set up a trading account.  It was during this stage of the investigation into Milrud that my counsel told me that he had a conversation with the AUSA in charge of the investigation, who advised that the US Attorney's Office was very excited about this investigation, that the office for the first time was given an entry into sophisticated trading cases, and that if I kept cooperating, I

would "get what I wanted."  Because I had told the government on several occasions that what I wanted was a non-prosecution resolution, I understood that the Government would not charge me if I continued cooperating against Milrud to the end.

21. Then, on December 18, 2014, my counsel had a meeting with the government.  During this meeting, I understood that my counsel were explicit that I would no longer cooperate unless the felony charges would not be reinstated.  After that meeting, the government continued using me as an active cooperator for the next six months to help the government finish one of the largest cases brought by that US Attorney's Office and what was believed would be the first indictment in the nation of a securities fraud charge based on high-frequency trading (and spoofing).  I believed that this continued cooperation after the December 2014 meeting meant that the government would not reinstate any charges because I had said I would no longer cooperate unless I would not be charged at the conclusion of my cooperation.

22. The government continued using me as a cooperator all through the summer of 2015, over a year after I refused to sign an additional tolling agreement upon the explicit statement that I was not signing so I could be sure everything was fully resolved a year later.  Yet, in July 2015, the government told me that the felony charges originally brought in July 2012 would be reinstated.

23.  On a number of occasions during the course of my cooperation with the Government, there were restrictions placed on my movements and my ability to travel, sometimes with very little justification.

**A detailed chronology of my cooperation follows below:**

24. As set forth below, for over three years I have provided unprecedented cooperation to two United States Attorney's Offices and the FBI, through proffer sessions, undercover informant work, and practical advice.

**Cooperation in the KYUS Deal**

25. My cooperation began – immediately after agreeing to cooperate with the government – as one would expect.  That is, the agents charged with working with me instructed me to meet with one of my co-conspirators in the KYUS deal, ███████████, and to attempt to get ████████ to talk about the KYUS deal, and any other fraudulent stock promotions that he may have done since then.  I was sent in to this first meeting with no additional instructions or guidance.  Just a few days after entering into my cooperation agreement, I arranged a meeting with ███████████████████████████████████████████.

26. ████████████████████████████████████████████████████.  I had not had any dealings with ████████ before this meeting, although I learned that the reason ████████ was invited to the meeting was that the two of them had tried to conduct a pump and dump scheme together, but it flopped.  In keeping with the agents' instructions, I got ████████ to acknowledge his role in the KYUS deal.  However, I went beyond the agents' requests, and improvised in a way that resulted in ██████████████, and myself agreeing to conspire to engage in another, new pump and dump scheme, this time involving ███████████████.

27. Shortly thereafter, on August 8, 2012, I met with ████████████████████████████████████████████████████.  During this meeting, ████████ stated that he wanted to take his company public, and that he was interested having ███████████████ and

myself "promote it."  (I did not meet with Sandberg again, and I do not know whether he was eventually charged with anything.)

28. Believing that I was a co-conspirator, ███████████████ continued to work on completing the promotion of ████. I worked with them to send out a materially misleading mailing promoting on ███ with information known to be false.  They took the affirmative step of agreeing to purchase software to "scrub" the email list that would be used to disseminate the false information.  ██████████████ and myself also discussed registering domain names and creating a landing page where investors would go after receiving an email blast.  I attended another meeting with ███████ at his office where we discussed how to pump up the CEII stock.  At that meeting, an individual named ████████████ joined, and without prompting began discussing promotions in which he was involved.  ██████ sent a follow-up email to me, which I promptly forwarded to the agents.

29. While ████████ had already engaged in the trades necessary to establish an act in furtherance of a conspiracy, the government desired additional evidence against DelPresto.  As a result, I continued to work with ████████████ wired $5,000 to me to pay for the software to scrub the e-mail list.  ████████ and myself "agreed" that the money would be paid to "Sur Club Sushi LLC" to provide ██████████ with deniability regarding his knowledge of the scrubbing.  It was my idea to set up this bogus LLC, and thus convince ██████████ to launder money.  In connection with this part of the operation, I created a business plan, business proposal, created a new limited liability corporation, and opened a bank account.  I believe that ████████ was arrested in early 2014 and became a cooperator with the government.

30. During this time, I was working almost full time with the government.  After I established Sur Club Sushi LLC, the agents then instructed me to fly to Las Vegas to Timothy

Sykes Penny Stock Conference and to find people to setup meeting with.  I was able to meet with (and record) ███████████, who owns a penny stock blogging website. And by chance I ran in to a broker from ████████████████████████. (████████████ is where Gottbetter had his shares in the KYUS deal.) During this conversation, Mohammad expressed a desire to engage in new promotion.  I met with Mohammed on two other occasions in the Bahamas during which meetings he pitched me on helping him with a penny stock promotion.

███ Also around this time, in September 2012, government agents asked me if I knew ███ ███, the CEO of ████████████████.  I had never heard of him.  ████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████ ███████████████████████████████████ █████████████████████████████████ ████████████████████████ ███████████████████████████ ██████████████████████████ █████████████████████████████████ ██████████

32. Meanwhile, ████████ and his girlfriend pitched me on doing another pump and dump using the company ████████ (a social media music company), which would cut out ████████. Shortly thereafter, I called and emailed with █████████████████████ ██████████████████████████████████ ██████████

33. At this point in the operation, however, the agents realized that if this fraudulent promotion actually occurred, innocent investors might be harmed.  Having reached the point where both ███████████ had engaged in sufficient acts to prove all elements of securities fraud, including "bid support" trading intended to manipulate the price of ██ stock done by ███████, I was asked to figure out how to end my undercover work without jeopardizing my cover.  On November 20, 2013 I came up with the idea of having the SEC send a letter to ████████████████████ inquiring into the trades that ████████ had done in ████████████████ that were being routed through ██████.

34. This idea worked.  The SEC sent Stock USA a letter questioning trades done in ███, which enabled me to plausibly act spooked, and tell my coconspirators that I was exiting the conspiracy.  ████████ girlfriend, ██████████, drove down to the ████████ offices to review the letter in late November 2012.  I do not know if any action has been taken or is being contemplated against ████████████.

35. I then set up meetings with ████████████████████ ████████ where ████████ was placing his trades and told me he had ownership interest.  The purpose of this meeting was twofold: to find a location to park the shares, and to uncover direct evidence of suspected involvement in market manipulation schemes.  During one of these recordings, Mr. ████████████████ ████████████████████████ ████████████ allegations of securities fraud, based, at least partially, on my cooperation.

36. Then, the agents informed me that they had given the United States Attorney's Office for the Southern District of New York copies of the audio recordings that I had made of ████████,

and that those recordings contributed in a meaningful way to the SDNY's ability to induce

████████ to begin cooperating with the government himself.  This cooperation eventually led to

the arrest of seven additional persons charged with securities fraud.

**Mike Taxon/Eric Sharon**

████ I also used my connections to locate high-value targets whose identity the government

did not know.  While cooperating against the original ████████████████████████████



**Adam Gottbetter**

38.  Adam Gottbetter was a practicing attorney who engaged in various penny stock pump

and dump schemes over the past decade, most significantly as the ringleader of KYUS.  KYUS

was Gottbetter's deal, and accordingly, Gottbetter was an original – and significant – target for

me to focus on.  I began working on getting Gottbetter to confess to his illegal actions in KYUS

immediately after starting to cooperate.

***DYNA***

39. I spoke with Gottbetter on July 20, 2012 to set up a meeting, met with him, along with ████████ on July 26th, at the Core Club in New York City. Similar to ████████, Gottbetter also wanted to work on a new deal. I played along, and discussed doing a new promotion. Gottbetter also admitted to being involved in another promotion on the symbol RACK, that apparently had failed, and so Gottbetter and ████████ sought my assistance. Coincidently, during a subsequent meeting with Gottbetter, on August 1st, Gottbetter spent the better part of the meeting talking about ████████, specifically how I should stay away from him because he was acting reckless and was being watched.

40. I arranged to meet with Gottbetter to discuss the deal down in the Bahamas towards the end of August. While this meeting did not take place because the agents asked me to cancel it, I met again with Gottbetter and ████████ in New York City during this time to discuss opening accounts and the ultimate division of profits upon the scheme's conclusion.

41. I understood what a difficult target Gottbetter was and began working on strategies to catch Gottbetter. Gottbetter articulated his desire to engage in a promotion, but was careful to not use language that could come back to haunt him, even as his conduct was clearly that of someone engaged in a pump and dump. For example, before any trades were placed for this promotion, I told Gottbetter that I had developed a new algorithm that would "pump the stocks," therefore freeing up the coconspirators to do other things. I explained to Gottbetter that I would create thirty separate accounts, which would be capable of automatically trading with each other to pump up the stock. ████████████████████████████████████████████ ████████████████████

42. This deal required me to find a brokerage firm to hold the penny stocks, and I suggested that I visit with two potential target broker-dealers that were well known in the penny stock

market manipulation world.  The best day to have this meeting happened to fall on Valentine's

Day. Despite my relationship with my wife being in recovery mode (after she agreed to withdraw

divorce filings), I still put my commitment to cooperation above everything else and agreed to be

away from my wife and two children that weekend, without comment. ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

43. I organized the materials for the mailer for DYNA and the government agreed to provide

$10,000 to have it designed and printed.  Once completed, I brought a sample mailer to

Gottbetter for a final meeting where I showed it to him, specifically pointed out all the false

statements contained therein, and asked him which price we should pick for where the price of

the stock was likely to go.  Gottbetter instructed me to pick a specific price and then said, "This

looks awesome. I never saw this."  Agents described this line to me as "the nail in the coffin."

44. It appeared that Gottbetter had finally made a mistake.  However, before placing any

trades, Gottbetter decided that DYNA could not be promoted effectively and cancelled the deal,

or at least suggested we put if off.  Thus, despite over a year of work, it appeared that the

government had insufficient evidence with which to charge Gottbetter.  However, I did not give

up.

*LIDO*

45. I was able to secure a meeting on August 8, 2013 with Gottbetter. Gottbetter charted a

private plane to come see me in White Plains NY, At the meeting, Gottbetter explained that he

had a new deal for us to work on involving now a new co-conspirator, K. David Stevenson, and

using an oil and gas company with the ticker LIDO, which would be changed into HBP Energy Corporation.

46. In connection with this new deal, I met with and covertly recorded ████████, who was supposed to provide promotional work and graphic design, and also C███████████████ ████████████████████████. Eventually ████████ joined to create a video pitch and the investor presentations. ████████ would later approach me seeking to do a side deal, also involving an pump and dump.

47. The government wired Gottbetter money to buy the shares in LIDO and I continued to meet with ████████ to advance the conspiracy. I met with ████████ at least four times. On November 17, 2013, immediately after the fourth meeting, and immediately after I left the hotel room in which we had met, the government arrested ████████ because of what I had developed against him. ████████████████████████████.

48. ████████ arrest took place in the middle of the conspiracy, before the government was ready to arrest other co-conspirators. The other co-conspirators, ████████ and Gottbetter, began asking me where ████████ was. On my own, I came up with several plausible excuses for why ████████ could not be located. Eventually, government agents took over ████████ e-mail account and began emailing with Gottbetter, with the agents posing as ████████.

49. Eventually I was told that sufficient evidence had been obtained and the agents asked me to figure a way to get out of the deal, again without arousing suspicion that I was cooperating. I concocted the story that ████████████████████████████████████ ████████ that he had used in the proposed DYNA deal, got scared and fled. Because all the automated trading was under ████ name, no trades could be placed without his involvement. I had described ██ as my frontman, and someone I had known for fifteen years. I told Gottbetter

that ██ had fled to Bermuda and that since he went missing everything would have to be on hold.

50. The agents then suggested that I try to hand Gottbetter a bag with $50,000 to pay ████████████████████████ finish the deal.  Gottbetter, however, refused, and in fact, stopped speaking with me after this suggestion.  Nevertheless, as I understand it, Gottbetter was arrested around Christmas 2013 and later pled guilty.

51. Because of Gottbetter's sophistication and caution, it took well over a year of work by myself before the government could obtain sufficient evidence to charge him.  Not only did I do so, but I also manufactured a basis on which I could plausibly cease work on the criminal scheme without revealing myself as a cooperator.

52. By January 2014, I had completed my cooperation against every single person who had been involved in the RVNG and KYUS deals.  Any future work would be on completely new targets, some whom I had not met prior to July 2012.  At that time, the United States Attorney's Office for the District of New Jersey offered me the opportunity to continue my cooperation against these new, additional, targets.


**Alex Milrud and High Frequency Trading**

53. My cooperation against Alex Milrud began on January 28, 2013, when I flew to Miami to meet with Milrud.  Given all of my other cooperation work going on at this time, the agents decided that the case against Milrud was a lesser priority, and deferred work on it until my other matters were resolved.

54. In the beginning of 2014, I resumed cooperating against Milrud, █████████████

███████████████ Previously, Milrud asked me if I could find a shell company with five

million unlisted shares.  Milrud was completely open about his intentions to break the law,

disclosing to me various fraudulent documents he could obtain, including fake passports and his

access to hacker who could purportedly break into online trading platforms like Etrade and

Ameritrade.  More importantly, Milrud told me that he was looking for a place to move his

"layering," i.e., his illegal high-frequency trading business.  Following numerous failed attempts,

I was finally able to arrange a meeting with Milrud in the Bahamas on August 27th 2014.

55. During a strategy session involving well over a dozen government attorneys and agents, I

was instructed to begin to lay the groundwork on Milrud at this upcoming meeting.  While much

was discussed at this meeting, no one in the room expected me to do much more than lay the

groundwork for what would be a long investigation into Milrud and his international criminal

network.  Indeed, I was told that if I "got 10% of what was discussed, that would be incredible."

56. The August 27th 2014 meeting with Milrud required significant improvisation on my part,

due to technical failures with the equipment the government had provided me to record the

meeting. As soon as Milrud entered my office, I started the computer that had spy software

installed that would capture each keystroke made on the computer.  Rather than start up as

normal, the computer downloaded software and began to set itself up for over 45 minutes,

because the government agent had failed to properly install the software before the meeting.

During that time, I had to improvise as to why my computer was going through the kind of set-

up expected from a brand-new machine.  In addition, the government required me to turn on the

audio recording system by remote control, a difficult enough maneuver in real time, compounded

by the fact that the recording device made a loud "click" when turned on and off.  Again, I

improvised, grabbed the remote control, and nonchalantly turned on the television, and at the same time the television was "clicking" on, hit the recording device, thus keeping the operation alive.

57. Ultimately, I was able not only to lay the groundwork for a future investigation into Milrud, but actually convinced him to log onto my computer and engage in fraudulent layering trading with his Chinese traders.

58. Milrud's strategy was extremely complex, and its criminality difficult to detect.  I met with representatives of the United States Attorney's Office for the District of New Jersey to give a detailed explanation of it.  Again, the government requested that I continue to cooperate to obtain additional evidence against Milrud and ███████, including getting him to place manipulative trades with a United States broker dealer.  To accomplish this, I offered to permit an undercover agent to open an account at Stock USA.

**Additional Assistance to the SDNY**

59. In addition to my direct cooperation, I have also assisted and trained other FBI agents working on other investigations.  For example, I met with an agent code-named ██████.  During the course of this meeting, I provided ██████ with step-by-step instructions regarding how to speak with a target in order to assess whether the target intended to break the law, or was merely being "aggressive" by attempting to take advantage of legitimate legal loopholes.  I provided ██████ with a believable cover story, and gave him a crash course on various financial instruments and tax strategies in preparation for his trip to Belize to meet with the targets of the investigation.

60. As a result of this training session, ██████ was able to infiltrate a securities fraud conspiracy that resulted in the arrest of six individuals in the Eastern District of New York on

charges of securities fraud, money laundering, and tax fraud. As reported by the New York Times, this was a $500 million fraud. This cooperation also led to a separate SEC action filed against Robert Bandfield and Andrew Godfrey.

**My Life has been Threatened**

61. One of my colleagues was threatened with physical violence and I myself was threatened, albeit obliquely during the course of my cooperation.  insinuated that he would go after me if he found out I was "the rat". Even in the face of threats to my person, I continued my cooperation with the government.

**Continuing Cooperation in 2015**

62. From January to July of 2015, my cooperation helped the government close ███, an unregistered broker dealer. This cooperation included recording a phone call with ███████ in June of 2015.

63. In July of 2015, Agent ████████ asked me find ████████ and get him to talk to me. I was subsequently able to talk to his brother.

64. In March of 2015, I traveled to Miami with an agent to record a meeting with ███ ████, █████████████, and four other individuals regarding the possibility of helping with a new deal using the fake algorithm.

65. Also in March of 2015, I recorded phone calls at the government's behest with , who was suspected of running pump and dump schemes.

66. In May of 2015, I provided the government with information concerning ████ ████ an individual targeted by the Securities and Exchange Commission for running an unregistered broker dealer.

**Summary of the Results of My Cooperation**

67. My cooperation has yielded impressive results.  As I understand it, my cooperation led to the arrest of my two co-conspirators in the KYUS scheme, ████ and Adam Gottbetter, both of whom have pled guilty.  Perhaps more significantly, my cooperation has directly resulted in the arrests of two individuals whom I did not know before the start of my cooperation: ██ ████.  I further believe that the quality of evidence I helped amass against ████ was a contributing factor to ████ decision to cooperate. ████ cooperation, in turn, resulted in a large-scale securities fraud and extortion prosecution by the United States Attorney's Office for the Southern District of New York that netted six additional defendants. (These six defendants are: Alexander Goldshmidt, Alex Puzaitzer, Michael Vax, Paul Orena, Yitz Grossman, Efim Aksanov, and Steve Koifman.) My cooperation against Alex Milrud, I was told, gave the US Attorney's Office a groundbreaking and highly-visible securities fraud case against an international high-frequency trader, whose conduct was so difficult to detect that even the FBI agents assigned to the case did not understand how the fraud was being perpetrated until I met with the government and explained it.



68. My cooperation has also resulted in the US Attorney's Office shutting down two broker-dealers with which I had no prior dealings, ████████.  In

connection with these investigations, my work contributed to trading in three stocks being halted,

████████████████████████████████████████████████████████.

69. In addition, I have brought other frauds to the attention of the Securities and Exchange Commission, including a fully investigated and documented insider trading case involving ████████████████, and an illegal market manipulation case involving ██████, another stock the trading of which was halted as a result of information I brought to the SEC.

70. My work has extended into several jurisdictions, and includes a meeting with Royal Mounted Canadian Police during which they deputized me as a "police agent" which enabled me to make recorded calls into Canada.  Indeed, shortly after I began cooperating, based on my immediate, quality cooperation, the various matters that I was engaged in were transformed from investigations into operations, thus enabling the government to access cash, to purchase securities, and to access other government services to assist in the work.   In fact, on August 20, 2012, Agent ██████████ called me and advised that he was writing a proposal to change the investigation to a "Group One Operation," in which he included a request for $1 million in funding and stated that what I wanted in return for my cooperation was not to be charged.

71. This entire time, my liberty has been substantially restricted as I have been subject to strict "private" bail conditions with the US Attorney's Office, my parents and I had to post a surety bond and confession of judgment, my travel was restricted, my lawfully possessed firearms were taken away, and I was required to do whatever the government instructed me to do.

72. I suffered significant stress during this time, I frequently had migraine headaches, I had to start taking medication for anti-anxiety, my marriage fell apart, my restaurant business collapsed, my other business ventures have suffered, and the burden of the legal expense.

73. The pubic outing of my arrest and cooperation has caused additional anxiety and strain, particularly the statements in local newspapers that I was a government cooperator and under investigation.

Dated:     Dade-Miami
           July 14, 2016

Sworn to before me this
__14__ day of July, 2016

_____
Notary Public

_____
Johan Sandoval
Commission # GG008062
Expires: July 4, 2020
Bonded thru Aaron Notary

_____
Guy Gentile