UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

GUY GENTILE

Hon. Jose L. Linares

Crim. No. 16-155 (JLL)

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
GUY GENTILE'S MOTION TO DISMISS THE INDICTMENT

PAUL J. FISHMAN
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:
NICHOLAS P. GRIPPO
PAUL A. MURPHY
MARK COYNE
Assistant United States Attorneys

TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................. iii

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND .................................................................................. 3

    A.    The Pump-and-Dump Scheme ................................................... 3

    B.    Gentile's July 2012 Arrest and Subsequent Events ...................... 5

    C.    Gentile's Cooperation ............................................................. 6

    D.    Meetings and Related Events in 2014 and 2015 .......................... 7

ARGUMENT ..................................................................................... 10

I.    The Indictment Was Timely Filed ....................................................... 10

    A.    The Applicable Statute of Limitations is Six Years ...................... 10

    B.    Gentile's Arguments Based on the Provision of
            Title 15 Charged in the Indictment are Meritless ....................... 19

    C.    Gentile's Two Statute of Limitations Waivers Did Not Require the
            Government to Bring Its Charges within the Wrong Limitations
            Period ................................................................................. 21

            i.    The Second Waiver Did Not Create a Deadline for the
                  Government to Indict Gentile ............................................ 22

            ii.    Waivers Need Not Be Notarized to Be Enforceable ............... 28

II.    Gentile Cannot Establish a Violation of the Sixth Amendment's
      Speedy Trial Provision ..................................................................... 29

    A.    Gentile Had No Sixth Amendment Speedy Trial Right While No
            Charges Were Pending ........................................................... 30

B.      Even if the Sixth Amendment's Speedy Trial Provision
        Applies, Gentile Cannot Establish a Violation Under the
        *Barker v. Wingo* Factors ............................................................ 36

III.    Gentile's Due Process Claims Fail Because the Government
        Never Promised Him That it Would Not Prosecute Him in Exchange
        For His Cooperation ............................................................................ 40

        A.      The Government Never Promised Gentile, Implicitly or
                Explicitly, that it Would Not Prosecute Him in Exchange
                for His Cooperation ................................................................... 40

        B.      Gentile's Fundamental Fairness Arguments Have No Merit ......... 44

IV.     The Court Should Deny the Bulk of Gentile's Arguments Without a
        Hearing ................................................................................................ 50

CONCLUSION .................................................................................................. 52

## TABLE OF AUTHORITIES

**CASES**                                                                                                      **PAGES**

American Steel Foundries v. Tri-City Central Trades Council,
        257 U.S. 184 (1921) ................................................................................. 12

Barker v. Wingo,
        407 U.S. 514 (1972) ..................................................................... 36, 37, 38

Behren v. United States,
        82 F.3d 1017 (8th Cir. 1996) ................................................................. 27

Betterman v. Montana,
        136 S. Ct. 1609 (2016) ...................................................................... 30, 33

Bruner v. United States,
        343 U.S. 112 (1952) ............................................................................... 12

Bulgin v. State,
        912 So. 2d 307 (Fla. 2005) .................................................................... 34

Clifton Mfg. Co. v. United States,
        76 F.2d 577 (4th Cir. 1935) ................................................................... 25

Cruz v. Maypa,
        773 F.3d 138 (4th Cir. 2014) ........................................................... 13, 14

Doggett v. United States,
        505 U.S. 647 (1992) ............................................................................... 36

*Ex Parte* Collett,
        337 U.S. 55 (1949) ................................................................................. 12

Forest v. U.S. Postal Serv.,
        97 F.3d 137 (6th Cir. 1996) ................................................................... 13

Gov't of the Virgin Islands v. A.M.,
        34 F.3d 153 (3d Cir. 1994) ................................................................ 2, 10

Hakeem v. Beyer,
        990 F.2d 750 (3d Cir. 1993) ......................................................... 34, 38, 39

Hughes Aircraft Co. v. United States ex rel. Schumer,
        520 U.S. 939 (1997) ............................................................................... 14

In re Exxon Mobil Corp. Sec. Litig.,
    500 F.3d 189 (3d Cir. 2007) ........................................................ 12

Klopfer v. State of North Carolina,
    386 U.S. 213 (1967) ...................................................................... 35

Landgraf v. USI Film Prods.,
    511 U.S. 244 (1994) ..........................................................11, 12, 14, 18

LaPorta v. United States,
    651 F. Supp. 884 (E.D. Pa. 1986) .............................................. 49

Lieberman v. Cambridge Partners, L.L.C.,
    432 F.3d 482 (3d Cir. 2005) ........................................................ 17

Pitts v. North Carolina,
    395 F.2d 182 (4th Cir. 1968) ...................................................... 34

Rohde v. United States,
    415 F.2d 695 (9th Cir. 1963) ...................................................... 23

S.S. Pierce Co. v. United States,
    93 F.2d 599 (1st Cir. 1937) ........................................................ 27

Sefen ex rel. United States v. Animas Corp.,
    607 F. App'x 165 (3d Cir. 2015) ................................................ 17

Steven I. v. Central Bucks Sch. Dist.,
    618 F.3d 411 (3d Cir. 2010) ........................................................ 13

Stogner v. California,
    539 U.S. 607 (2003) ..........................................................14, 15, 16, 17

Strange v. United States,
    282 U.S. 270 (1931) ...................................................................... 23

United States v. Badaracco,
    954 F.2d 928 (3d Cir. 1992) ........................................................ 41

United States v. Barbosa,
    271 F.3d 438 (3d Cir. 2001) ........................................................ 45

United States v. Battis,
    589 F.3d 673 (3d Cir. 2009) ........................................................ 34

United States v. Beckett,
    208 F.3d 140 (3d Cir. 2000) ........................................................ 31

United States v. Beverly,
   723 F.2d 11 (3d Cir.1983) ................................................................... 46

United States v. Buffalo Amusement Corp.,
   600 F.2d 368 (2d Cir. 1979) .............................................................. 34

United States v. Carrillo,
   709 F.2d 35 (9th Cir. 1983) ................................................... 47, 48, 49

United States v. Christie,
   624 F.3d 558 (3d Cir. 2010) .............................................................. 45

United States v. Colombo,
   852 F.2d 19 (1st Cir. 1988) ..................................................... 31, 32, 34

United States v. Crusco,
   536 F.2d 21 (3d Cir. 1976) ............................................................... 41

United States v. De La Mata,
   266 F.3d 1275 (11th Cir. 2001) ................................................... 15, 16

United States v. Driscoll,
   852 F.2d 84 (3d Cir. 1988) ......................................................... 45, 46

United States v. Durham,
   413 F.2d 1003 (5th Cir. 1969) .......................................................... 34

United States v. Feinberg,
   383 F.2d 60 (2d. Cir. 1967) .............................................................. 34

United States v. Fischer,
   93 F.2d 488 (2d Cir. 1937) ............................................................... 23

United States v. Friedman,
   649 F.2d 199 (3d Cir. 1981) .............................................................. 21

United States v. Gambino,
   788 F.2d 938 (3d Cir. 1986) .............................................................. 45

United States v. Gonzales,
   927 F.2d 139 (3d Cir. 1991) .............................................................. 45

United States v. Grimes,
   142 F.3d 1342 (11th Cir. 1998) ......................................................... 16

United States v. Hillegas,
   578 F.2d 453 (2d. Cir. 1978) ............................................................ 36

United States v. Hoffecker,
    530 F.3d 137 (3d Cir. 2008) ..................................................................... 45

United States v. Hudson,
    609 F.2d 1326 (9th Cir. 1979) ............................................................. 49, 50

United States v. Jannotti,
    673 F.2d 578 (3d Cir. 1982) ..................................................................... 46

United States v. Jeffries,
    405 F.3d 682 (8th Cir. 2005) .............................................................. 16, 19

United States v. Jimenez,
    256 F.3d 330 (5th Cir. 2001) .............................................................. 40, 41

United States v. Knipp,
    963 F.2d 839 (6th Cir. 1992) ..................................................................... 16

United States v. Koller,
    956 F.2d 1408 (7th Cir. 1992) ................................................................... 38

United States v. Krynicki,
    689 F.2d 289 (1st Cir. 1982) ..................................................................... 36

United States v. Lakhani,
    480 F.3d 171 (3d Cir. 2007) .............................................................. 45, 46

United States v. Lewis,
    2013 U.S. Dist. LEXIS 173783 (N.D. Tex. Dec. 9, 2013)
        aff'd on other grounds, 774 F.3d 837 (5th Cir. 2015) ...................... 15, 18

United States v. Lombardozzi,
    467 F.2d 160 (2d Cir. 1972) .............................................................. 49, 50

United States v. Lovasco,
    431 U.S. 783 (1977) ................................................................................. 30

United States v. MacDonald,
    456 U.S. 1 (1982) ......................................................................... 30, 31, 32

United States v. Madia,
    955 F.2d 538 (8th Cir. 1992) ..................................................................... 16

United States v. Marion,
    404 U.S. 307 (1971) .......................................................................... 30, 31

United States v. McGaughey,
    977 F.2d 1067 (7th Cir. 1992) ................................................................. 23

United States v. McHan,
    101 F.3d 1027 (4th Cir.1996) ................................................................. 40

United States v. Nolan-Cooper,
    155 F.3d 221 (3d Cir. 1998) ..................................................... 45, 46, 47

United States v. Oliver,
    238 F.3d 471 (3d Cir. 2001) ................................................................. 36

United States v. Pascal,
    496 F. Supp. 313 (N.D. Ill. 1979) .......................................................... 47

United States v. Pelullo,
    399 F.3d 197 (3d Cir. 2005) ........................................................... 27, 51

United States v. Richardson,
    512 F.2d 105 (3d Cir. 1975) ................................................................. 18

United States v. Robert,
    515 F.2d 642 (2d Cir. 1975) ................................................................. 34

United States v. Sebetich,
    776 F.2d 412 (3d Cir. 1985) ................................................................. 31

United States v. Simmonds,
    111 F.3d 737 (10th Cir. 1997) ............................................................... 13

United States v. Spector,
    55 F.3d 22 (1st Cir. 1995) ............................................................. 28, 29

United States v. Sure Chief,
    438 F.3d 920 (9th Cir. 2006) ...................................................... 16, 19, 20

United States v. Twigg,
    588 F.2d 373 (3d Cir. 1978) ........................................................... 45, 46

United States v. Voigt,
    89 F.3d 1050 (3d Cir. 1996) ................................................................. 45

United States v. West,
    511 F.2d 1083 (3d Cir. 1975) ......................................................... 45, 46

Vernon v. Cassadaga Valley Cent. Sch. Dist.,
    49 F.3d 886 (2d Cir. 1995) ................................................................. 13

Wilson v. Pena,
   79 F.3d 154 (D.C. Cir. 1996) ....................................................................... 13

## **Statutes**

15 U.S.C. § 78ff........................................................................................ 19, 20

18 U.S.C. § 371......................................................................................... 20

18 U.S.C. § 3161....................................................................................... 36

18 U.S.C. § 3288....................................................................................... 21

18 U.S.C. § 3301.................................................................................. 10, 20

28 U.S.C. § 1746....................................................................................... 28

## **Rules**

Fed. R. Civ. P. 56(c) ................................................................................. 28

Fed. R. Crim. P. 7(c)(1) ....................................................................... 20, 21

Fed. R. Evid. 1101(d)(3) ............................................................................. 2

Fed. R. Evid. 410(b)(1) ............................................................................... 2

**PRELIMINARY STATEMENT**

Defendant Guy Gentile orchestrated a multi-year securities fraud scheme through which he profited handsomely at the expense of potentially thousands of duped investors.  His criminal conduct involved sophisticated, off-shore operations designed to manipulate the market and fool investors in two publicly traded companies out of millions of dollars.  What made Gentile such an accomplished criminal explains why he was such a valuable cooperator – he was deeply enmeshed in the world of stock market manipulation.

Despite his widespread criminal conduct, Gentile asks the Court to accept that the Department of Justice promised not to prosecute him for his crimes.  In making this argument, he ignores his own counsel's admissions to the contrary in an October 2014 letter to the U.S. Attorney's Office ("USAO") that no such promise was ever made.  Specifically, in seeking a non-felony disposition for Gentile, defense counsel wrote, in pertinent part:

> As you and I discussed during our August 14 meeting in Newark, Gentile has been unwavering in his commitment to your office, despite the absence of any assurance as to how this matter might end for him.  Indeed, in late August of this year, even after two full years of significant cooperation, and after you stated that your office would <u>not</u> make any commitment to exercise leniency, or indeed to do anything other than proceed with the originally contemplated felony charges, Gentile nevertheless agreed to continue his cooperation.

(Letter of Adam Ford, dated October 10, 2014 ("Ford Letter")) (emphasis in original).[1]

---

[1] The Ford Letter includes statements from Gentile's counsel that were made in the context of plea discussions.  The Government has submitted a copy of the complete Ford Letter to the Court for in camera review to determine whether it, or any aspect of

In the face of these plain admissions by sophisticated criminal defense counsel, Gentile asks the Court to accept that the Government promptly reversed course and thereafter agreed not to prosecute him.  This claim is quite simply unfounded.

So are Gentile's other arguments seeking to dismiss the indictment.  The Court should set aside all of Gentile's overblown rhetoric and deny his motion to dismiss for the simple reason that none of his arguments has merit.

First, this prosecution is not time barred.  The applicable statute of limitations is six years, not five, as Gentile incorrectly claims.  Further, Gentile's written waivers unambiguously tolled two separate, one-year periods from the calculation of the limitations period and are fully enforceable.  Those waivers did not impose an artificial deadline for the Government to file an indictment or create a different statute of limitations for this case, as Gentile now claims.

Second, Gentile's Sixth Amendment speedy trial argument fails because the Sixth Amendment does not provide a speedy trial right when a case is dismissed, as this one was in 2012, and, even if it did, Gentile cannot satisfy

---

it, should be filed under seal.  It is undisputed that the portions of that letter quoted herein are appropriate for public disclosure. Moreover, the Government notes that Rule 410 of the Federal Rules of Evidence, which generally provides that plea discussions are not admissible at trial, is inapplicable to this motion.  *See* Fed. R. Evid. 1101(d)(3) (Rules of Evidence do not apply to "a preliminary examination in a criminal case"); *see, e.g., Gov't of the Virgin Islands v. A.M.*, 34 F.3d 153, 161-62 (3d Cir. 1994) (Rules of Evidence do not apply to juvenile transfer hearing).  And, even if it did govern here, the statements referenced in this motion would be admissible under the terms of Rule 410 because the defendant has submitted other statements from those plea discussions, and those statements and the statements from the Ford Letter referenced herein "in fairness . . . ought to be considered together."  Fed. R. Evid. 410(b)(1).

the exacting standard required by the Supreme Court. Any delay was to his benefit, as he was given the opportunity to cooperate for several years in lieu of being prosecuted, and any prejudice he may have suffered as a result is minimal and far outweighed by the benefits he realized during that time.

Third, Gentile's due process arguments fail because they are based on alleged promises by the Government that simply did not occur. The Ford Letter confirms as much in unambiguous terms. The Government agreed to give Gentile an opportunity to persuade the USAO leadership that he should not be charged with a felony, and it did so. But since the decision did not go his way, Gentile now seeks to recast events and stitch together a vague, unwritten non-prosecution agreement. His assertions in this regard are false, flatly contradicted by his counsel's own admissions, and inconsistent with the parties' course of conduct. Beyond that, the Due Process Clause requires dismissal of an indictment only in the face of extraordinary Government misconduct. Even accepting Gentile's allegations as true, nothing of the sort happened here.

**BACKGROUND**

**A.    The Pump-and-Dump Scheme**

In 2007 and 2008, Gentile and his co-conspirators engaged in an extensive pump-and-dump stock manipulation scheme involving two publicly traded companies, Raven Gold Corporation and Kentucky USA, Inc. (the "Target Companies"). As part of the scheme, the conspirators first obtained control over large blocks of the free-trading shares of the Target Companies,

3

then "pumped" the price of those shares by, among other things: (i) engaging in manipulative trading of the stocks of the Target Companies, and (ii) disseminating misleading promotional materials touting the stocks and encouraging others to purchase them.  (Dkt. No. 1, ¶¶ 1(f)-(h)).

For example, in the Raven Gold phase of the scheme, the co-conspirators engaged in coordinated trades in which they were on both the "buy" and "sell" side of the same trades.  The co-conspirators used similar strategies in manipulating KYUS's stock.  (*Id.* at ¶¶ 6, 11).  Additionally, the co-conspirators caused the wide dissemination of promotional mailers that touted Raven Gold and KYUS and included numerous false and misleading statements about the companies and their prospects.  (*Id.* at ¶¶ 7, 12).

After pumping the stocks, the co-conspirators "dumped" them by selling large blocks to victim-investors at artificially inflated prices, generating approximately $17.2 million in gross trading proceeds.  Following the dump phase, the Target Companies' stock prices dropped, causing victim-investors to suffer significant losses.  (*Id.* at ¶1(j)).

Gentile played a hands-on, high-level role in this scheme and was not merely a passive participant.  Indeed, Gentile controlled virtually all of the manipulative trading in the KYUS manipulation, was deeply involved in the promotional mailers that were at the center of the fraud, and was responsible for collecting and distributing millions of dollars in illicit proceeds generated by the scheme.  (*Id.* at ¶11-4(b) and (c)).

4

### B.    Gentile's July 2012 Arrest and Subsequent Events

On June 25, 2012, Gentile was charged in a sealed criminal complaint with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.  On Friday, July 13, 2012, FBI agents arrested Gentile. Gentile quickly expressed interest in cooperating with law enforcement.  On Saturday and Sunday of that weekend, Gentile and his counsel met with representatives of the FBI and the USAO for debriefings.

During those meetings, Gentile admitted his involvement in the pump-and-dump scheme and identified numerous others involved in similar securities fraud schemes.  He claimed to have relationships with those individuals, and offered to engage in proactive cooperation against some of them.  The following Monday, July 16, 2012, the Government submitted an application to the Court to dismiss without prejudice the complaint against Gentile (which had not yet been made publicly available).  That day, the Court entered an order dismissing the complaint without prejudice.  The purpose of dismissing the complaint was to preserve the cooperation opportunities that Gentile presented over the weekend.

After the complaint was dismissed, the parties took various steps to facilitate Gentile's cooperation while protecting his interests and the Government's.  For instance, because he was not subject to the supervision of the Court or Pretrial Services, the Government sought limited, reasonable assurances that he would not flee.  Gentile had a fully operational broker-dealer in the Bahamas and was opening a sushi restaurant there.  He also

claimed to be seeking permanent residency in the Bahamas.  Gentile had family in Jamaica and Italy, was a dual citizen of the United States and Italy, and had multiple passports.  Accordingly, on August 1, 2012, Gentile signed an unsecured appearance bond in the amount of $175,000 and a confession of judgment in favor of the United States in the same amount.  Gentile's parents signed a $100,000 unsecured appearance bond and confession of judgment in favor of the United States in that amount.  Gentile also agreed to turn over his passports to his attorneys and refrain from traveling internationally without the Government's consent.

Moreover, to preserve the Government's ability to prosecute Gentile in the future, Gentile signed a waiver tolling "any statute of limitations" relating to the wire fraud and securities fraud statutes and related regulations for the period of July 31, 2012 through July 31, 2013 (the "First Waiver").  He signed the First Waiver without any negotiation or discussion with the Government about its terms.  One year later, Gentile signed a second statute of limitations waiver for the period of July 31, 2013 through July 31, 2014 containing virtually the same terms, again without any discussion or negotiation with the Government concerning its terms (the "Second Waiver").  (*See* Affidavit of Adam Ford ("Ford Affidavit"), ¶¶ 34-35, Exhibits F and G).

### C.    Gentile's Cooperation

During the two years after his arrest, Gentile's cooperation included engaging in recorded calls and meetings with potential targets of investigations and meeting with law enforcement agents and representatives of the USAO and

the United States Securities and Exchange Commission ("SEC").  As Gentile has conceded, during this time, the Government never promised that he would not be prosecuted.  To the contrary, it was always the Government's expectation that Gentile would face criminal charges, and that fact was clearly conveyed to Gentile's experienced criminal defense counsel, as reflected in the Ford Letter.  (*See* Ford Letter at 1-2).

Meanwhile, Gentile continued to operate two securities brokerage firms (one in New York and one in the Bahamas), engaged in other business ventures, participated in various community and civic activities, and traveled extensively.  For instance, between August 2012 and February 2015, Gentile routinely traveled to the Bahamas for both business and personal purposes, went to Italy in July 2013, and went to Jamaica in May 2014.

### D.    Meetings and Related Events in 2014 and 2015

On October 10, 2014, after meeting with the FBI, USAO and SEC in August 2014 to discuss a significant securities fraud investigation in which Gentile was cooperating (the "2014 Investigation"), Gentile's counsel submitted the Ford Letter detailing his cooperation and arguing that a deferred prosecution agreement would be the appropriate disposition to any criminal charges against Gentile.  The Ford Letter expressly referenced the August 2014 meeting, and provided:

> As you and I discussed during our August 14 meeting in Newark, Gentile has been unwavering in his commitment to your office, despite the absence of any assurance as to how this matter might end for him.  Indeed, in late August of this year, even after two full years of significant cooperation, and after you stated that your office would <u>not</u> make any commitment to exercise leniency, or

7

> indeed to do anything other than proceed with the originally
> contemplated felony charges, Gentile nevertheless agreed to
> continue his cooperation.  The very next week, he traveled to the
> Bahamas and obtained sufficient evidence to build a case against a
> high-value international stock manipulator, and perhaps the first
> significant indictment for high-frequency trading.  Despite what at
> the time appeared to be gratuitous cooperation that would not
> benefit Gentile in any concrete way, Gentile's continued
> cooperation has achieved concrete results for your office.

(Ford Letter at 1-2) (emphasis in original).

The Ford Letter also confirmed that "[a]t this meeting, Gentile was reminded that he very well might face the same outcome in his criminal case, whether he cooperated or not" and that "Gentile reiterated his desire to continue cooperating without any expectations regarding the ultimate disposition of the case." (*Id.* at 7).

Gentile's counsel nonetheless alleges that sometime later, he had a conversation with one of the AUSAs assigned to this matter in which the AUSA stated that if Gentile completed his cooperation in the 2014 Investigation, he "would get what he wanted." (Ford Affidavit, ¶ 21).  If asked about this conversation, this AUSA would say that he never told Gentile's counsel, or anybody else, that Gentile would "get what he wanted" if he continued to cooperate.

After Gentile's counsel submitted the Ford Letter, Gentile continued his cooperation in the 2014 Investigation.  He also requested the meeting he had been promised with the USAO leadership to set forth all of the reasons why, in his view, a non-felony disposition was appropriate.

8

The meeting with the USAO leadership took place on December 18, 2014. The USAO did not reach any decisions regarding Gentile's status during or immediately after this meeting. Gentile's counsel did not state during the December 18, 2014 meeting, or after it, that Gentile would not continue to cooperate until the USAO reached a decision on any potential criminal charges against him. Afterwards, Gentile continued to cooperate, mainly with respect to the 2014 Investigation, which resulted in charges against another individual in January 2015. In addition, Gentile assisted in a few other sporadic investigative actions between January 2015 and June 2015, but was given no assurances, express or implied, that his continued cooperation in these matters would result in a non-felony disposition.

Instead, in or around June 2015, the USAO notified Gentile's counsel that it would not agree to a non-felony disposition, but that it was prepared to proceed with a felony disposition pursuant to a binding plea agreement which, if accepted by the Court, would result in a sentence of probation. Thereafter, on July 8, 2015, Gentile's counsel asked the USAO to reconsider its decision. Although the USAO had already had numerous discussions with Gentile's counsel and had fully considered their arguments about the disposition of the case, the USAO agreed to a second meeting between counsel and the USAO leadership. That meeting took place on September 24, 2015. Shortly thereafter, the USAO reported back to counsel that it had not changed its position. The present indictment followed, after several unsuccessful efforts to reach a plea agreement.

9

**ARGUMENT**

## I.   The Indictment Was Timely Filed.

Gentile first argues that the indictment should be dismissed because it was filed outside of the statute of limitations.  In support of this argument, he urges the Court to apply an outdated five-year statute of limitations that was replaced in July 2010 (nearly six years before the indictment was filed) with a six-year statute of limitations, and to disregard two separate statute of limitation waivers that he signed so that he could continue to cooperate with the Government and delay a prosecution.  (Def. Br. at 19-31).  These arguments are meritless.

### A.   The Applicable Statute of Limitations is Six Years.

The indictment was filed on March 23, 2016.  At that time, the statute of limitations for securities fraud and conspiracy to commit securities fraud was six years.  *See* 18 U.S.C. § 3301 ("No person shall be prosecuted, tried, or punished for a securities fraud offense, unless the indictment is found or the information is instituted within six years after the commission of the offense.").  This statute was enacted on July 21, 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") and took effect the following day.  *See* Pub. L. No. 111-203, § 4, 124 Stat. 1376, 1390 (Jan. 5, 2010).  The Dodd-Frank Act's subsection containing the new six-year statute of limitations was titled "EXTENSION OF STATUTE OF LIMITATIONS FOR SECURITIES FRAUD VIOLATIONS." *Id.* at § 1079A(b).

10

Gentile argues that the six-year limitations period does not apply in this case because the conduct alleged in the indictment predates the Dodd-Frank Act, and that such application would have an impermissible retroactive effect. (Def. Br. at 20).  He is wrong.  Every court to decide the question since the Supreme Court's seminal decision in *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994), has held that legislation simply extending a statute of limitations that has not yet expired does not have an improper retroactive effect and does not violate the Ex Post Facto Clause.  There is no reason in law or logic for this Court to be the first to hold otherwise.

In *Landgraf*, the Supreme Court distinguished between statutes that affect substantive rights, liabilities or duties, for which a presumption against retroactivity applies, and statutes that do not, such as statutes that regulate rules of procedure.  *Id.* at 265-280.  The Court explained that "[w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach."  *Id.* at 280.  If the statute contains no such express command, "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  *Id.*  If the statute has such an effect, the "traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."  *Id.*  That presumption, however, "has consistently been explained by reference to the unfairness of imposing

11

*new* burdens on persons after the fact." *Id.* at 270 (emphasis added).  Thus,

"the court must ask whether the new provision attaches *new* legal

consequences to events completed before its enactment." *Id.* at 269-70

(emphasis added).

Unlike, say, the statute of limitations in the Sarbanes-Oxley Act, *see In re*

*Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189 (3d Cir. 2007), § 3301 does not

clearly state in its text whether it applies to actions arising from pre-enactment

conduct.  But "[e]ven absent specific legislative authorization, application of

new statutes passed after the events in suit is unquestionably proper in many

situations." *Landgraf*, 511 U.S. at 273.  For example, "[c]hanges in procedural

rules may often be applied in suits arising before their enactment without

raising concerns about retroactivity." *Landgraf*, 511 U.S. at 275.  Because

"rules of procedure regulate secondary rather than primary conduct, the fact

that a new procedural rule was instituted after the conduct giving rise to the

suit does not make application of the rule at trial retroactive." *Id.*[2]

*Landgraf* did not address whether legislation that alters a limitations

period has an improper retroactive effect if applied to pre-enactment conduct.

But after *Landgraf*, the Third Circuit adopted the general principle that

"retroactivity concerns do not bar a changed limitation period's application to a

---

[2]  Other examples include statutes that authorize or affect the propriety of prospective
relief, jurisdictional statutes, and statutes regulating procedural rules.  *Id.* at 273-75;
*see, e.g.*, *Bruner v. United States*, 343 U.S. 112, 116 (1952) (dismissing case where
jurisdictional statute subsequently repealed); *Ex parte Collett*, 337 U.S. 55, 71 (1949)
(procedural statute governed transfer of action instituted prior to statute's enactment);
*American Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184 (1921)
(applying statute authorizing injunctive relief enacted while case was pending).

suit filed after the amendment's effective date.'"  *Steven I. v. Central Bucks Sch. Dist.*, 618 F.3d 411, 414 (3d Cir. 2010) (quoting *United States v. Simmonds*, 111 F.3d 737, 745 (10th Cir. 1997), *overruled on other grounds by United States v. Hurst*, 322 F.3d 1256 (10th Cir. 2003)); *accord Vernon v. Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 890 (2d Cir. 1995).[3]  The Third Circuit reasoned that "the statute of limitations" governs a plaintiff's "conduct in filing the claim, not" a defendant's "conduct giving rise to the claim."  *Id.* at 414.

Noting that statutes of limitations "lie on the cusp of" *Landgraf*'s procedural/substantive distinction, the Third Circuit explained that:

> rules of procedure regulate secondary, rather than primary conduct.  Statutes of limitations regulate secondary conduct, *i.e.*, the filing of a suit, not primary conduct, *i.e.*, the actions that gave rise to the suit.  Thus, the fact that a new statute of limitations was enacted after the primary conduct giving rise to the suit occurred, namely the filing of the claim, does not make application of the new statute of limitations unfair from a 'retroactivity' standpoint because the secondary conduct governed by the statute of limitations occurred after its effective date.

*Id.* at 414, n.7 (citations omitted).

It is true that *Steven I.* dealt with a statute enacting for the first time a limitations period for a particular claim, thereby shortening the plaintiff's time to assert that claim if based upon pre-enactment conduct. But the same rule holds true even when the enactment gives a plaintiff more time to assert his claim, so long as the enactment does not revive an otherwise time-barred claim.  *See, e.g., Cruz v. Maypa*, 773 F.3d 138,

---

[3]  *See Forest v. U.S. Postal Serv.*, 97 F.3d 137, 140 (6th Cir. 1996); *Wilson v. Pena*, 79 F.3d 154, 162 (D.C. Cir. 1996).

13

145 (4th Cir. 2014) (holding "that applying the TVPRA's extended limitations period to claims that were unexpired at the time of its enactment does not give rise to an impermissible retroactive effect under *Landgraf*").  *See also Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 950 (1997) ("[t]he 1986 amendment would revive that action, subjecting Hughes to previously foreclosed *qui tam* litigation, much like extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action," which *Landgraf* forbids).

    As the Fourth Circuit explained in *Cruz*, "applying a new limitations period to unexpired claims does not 'attach[] new legal consequences to events completed before its enactment.'" 773 F.3d at 145 (quoting *Landgraf*, 511 U.S. at 270). "As long as the claims were alive at enactment, extending a statute of limitations does not 'increase a party's liability for past conduct,' because the party already faced liability under the shorter limitations period." *Id.* (quoting *Landgraf*, 511 U.S. at 280).  "Such an extension does not introduce new legal consequences, but rather merely prolongs the time during which legal consequences can occur." *Id.*  Moreover, the Fourth Circuit held squarely that "in the criminal context, … extending a limitations period before prosecution is time-barred does not run afoul of the Ex Post Facto Clause of the Constitution." *Id.*  "This is because a defendant facing unexpired claims has never been 'safe from … pursuit,' and has always had incentive to preserve exculpatory evidence. *Id.* (quoting *Stogner v. California*, 539 U.S. 607, 611

14

(2003)).  Finally, "*Landgraf* and the Ex Post Facto Clause are informed by the

same retroactivity concerns."  *Id.*

     Notably, in *United States v. Lewis*, 12-CR-15, 2013 U.S. Dist. LEXIS

173783 (N.D. Tex. Dec. 9, 2013), *aff'd on other grounds*, 774 F.3d 837 (5th Cir.

2015), the court held that § 3301 applied to a case involving a securities fraud

scheme that predated the Dodd-Frank Act, rejecting the exact argument that

Gentile advances here.  *Id.* at *27.  The *Lewis* court reasoned:

> The government is not relying on the Dodd-Frank Act to revive a
> previously time-barred claim.  The five-year limitations period had
> not expired as to Lewis' criminal conduct on the date the Dodd-
> Frank Act took effect to enlarge the limitations period to six years.
> *This is a critical distinction.*  When claims are already time-barred
> at the time the limitations period is enlarged, a clear statement
> from Congress is required before a court will apply an amendment
> retroactively to revive the claim....  But a clear statement from
> Congress is generally not required when an amendment is applied
> to pre-amendment conduct and the amendment merely extends
> the limitations period for unexpired claims but does not revive
> expired claims.

*Id.* at *34 (emphasis added).

     This case presents the same situation as in *Cruz* and *Lewis*:  Gentile's

criminal conduct was chargeable when the statute of limitations period

changed.  Therefore, the new, longer limitations period applies to his conduct

and, for the same reason, does not violate the Ex Post Facto Clause.  The

indictment alleges that the conspiracy extended through in or around June

2008.  The Dodd-Frank Act became effective roughly two years later – well

within the five-year limitations period that previously had applied.  *See United*

*States v. De La Mata*, 266 F.3d 1275, 1286 (11th Cir. 2001) ("[T]he law is well-

settled that extending a limitation period before a given prosecution is barred does not violate the ex post facto clause."); *cf. Stogner*, 539 U.S. at 632–33 (holding that "a law enacted after expiration of a previously applicable limitations period violates the Ex Post Facto Clause when it is applied to revive a previously time-barred prosecution," but noting that its holding did not affect cases in which courts "have upheld extensions of unexpired statutes of limitations").

Courts in criminal cases have consistently applied statutes of limitations that were extended after the offense conduct occurred but before the previous limitations period expired.  *See United States v. Sure Chief*, 438 F.3d 920, 922–25 (9th Cir. 2006) (holding that prosecution for aggravated sexual abuse was timely under a statute of limitations enacted after offense conduct but before expiration of previously applicable limitations periods); *United States v. Jeffries*, 405 F.3d 682, 685 (8th Cir. 2005) (same); *De La Mata*, 266 F.3d at 1286–93 (application of new statute of limitations for bank fraud charges permitted where previous limitations period had not expired at time of enactment); *United States v. Grimes*, 142 F.3d 1342, 1351 (11th Cir. 1998) (applying seven-year statute of limitations to federal explosives offense committed at time when five-year limitations period applied where extension took place before prior five-year period expired); *United States v. Knipp*, 963 F.2d 839 (6th Cir. 1992) (extended statute of limitations for bank fraud applied where prior limitations period had not expired at time of enactment); *United States v. Madia*, 955 F.2d 538, 539 (8th Cir. 1992) (same).

16

Contrary to all this authority, Gentile argues that applying § 3301's six-year limitations period here would have "classic retroactive effect" by "abolishing a complete defense to the charges" and thereby "increasing [his] liability for past conduct." (Def. Br. at 22).  But when the Dodd-Frank Act went into effect, Gentile did not have a "complete defense," as the prior five-year limitations period had not yet expired.  The controlling date for retroactivity purposes is the date the statute in question was enacted.  *See Stogner,* 539 U.S. at 632 (emphasizing that when a new statute of limitations is used to revive a time-barred prosecution, "[i]t retroactively withdraws a complete defense to prosecution after it has already attached[.]").  On that date, the old limitations period for Gentile's conduct had not yet expired, so there is no *ex post facto* or retroactivity concern.

Although Gentile invokes *Sefen ex rel. United States v. Animas Corp.*, 607 F. App'x 165 (3d Cir. 2015), that non-precedential opinion says nothing to the contrary.  There, applying the Dodd-Frank Act's new three-year limitations period for retaliation claims under the False Claims Act would have had an impermissible retroactive effect because the prior limitations period *had* already expired when the plaintiff filed his claim.  *Id.* at 167.  Thus, applying the new statute of limitations "would revive a moribund cause of action, increasing a party's liability for past conduct."  *Id.* (quotation marks omitted); *see Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 492 (3d Cir. 2005) ("the resurrection of previously time-barred claims 'increase[s] a party's liability' by abolishing a complete defense to suit").  This is *Lewis*'s "critical

17

distinction," and one which Gentile fails to address. 2013 U.S. Dist. LEXIS 173783, at *34.

Gentile also cites *United States v. Richardson*, 512 F.2d 105 (3d Cir. 1975) (per curiam), which held that an indictment charging violations of the Selective Service Act of 1967 was untimely. In so doing, the Third Circuit declined to apply an extended limitations period enacted after the defendant's offense because the court "could not discern a clear intention on the part of Congress" to apply that extended period to conduct occurring before the enactment. *Id.* at 106. *Richardson*, however, predates and cannot be reconciled with *Landgraf*, *Steven I.,* or *Lieberman*. Under those precedents, "a court must examine whether the statute would have an adverse effect if it were held to be retroactive; that is to say, 'whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Lieberman*, 482 F.3d at 488–89 (quoting *Landgraf*, 511 U.S. at 280). Because § 3301 does none "of these things," it can "be applied retroactively," even "absent [the] clear congressional intent" that *Richardson* formerly required. *Lieberman*, 432 F.3d at 489 (quotation marks omitted).

In any event, the portion of the Dodd-Frank Act enacting § 3301 is expressly captioned as an "EXTENSION" of the statute of limitations for securities fraud violations. Pub. L. No. 111-203, § 1079A(b), 124 Stat. at 2079. Thus, even if *Richardson* remains good law, the Dodd-Frank Act contains a clear enough manifestation of Congressional intent to apply § 3301 here. *Cf.*

18

*Jeffries*, 405 F.3d at 684 ("[B]oth the title and the wording of § 3509(k) indicate that Congress intended by it to extend the general statute of limitations. When enacted in 1990, it was entitled 'Extension of child statute of limitations' and it stated that no statute of limitations that would otherwise preclude prosecution should act as a bar before the victim reaches the age of twenty five."); *Sure Chief*, 438 F.3d at 925 ("Because Congress evinced a clear intent to extend, rather than shorten, the statute of limitations applicable to sexual abuse crimes, and because there is no *ex post facto* problem here, the prosecution was timely.  In so holding, we parallel the Eighth Circuit's approach to this very issue" in *Jeffries*.).

Accordingly, the six-year statute of limitations applies here.

**B.    Gentile's Arguments Based on the Provision of Title 15 Charged in the Indictment are Meritless.**

Gentile next argues that the indictment is time-barred because it charged him with violating 15 U.S.C. § 78ff while both the Dodd-Frank Act and the two statute of limitation waivers he signed expressly reference § 78ff(a). (Def. Br. at 23-24).  Essentially, Gentile asks the Court to relieve him of § 3301's six-year limitations period and his limitations waivers because they only identify the specific penalty provision of § 78ff they cover, whereas the indictment broadly charges § 78ff, which has two other penalty provisions besides § 78ff(a).  This argument is a red-herring.

Section 78ff(a) criminalizes willful violations of the federal securities laws. 15 U.S.C. § 78ff(a).[4]  Subsections (b) and (c) apply to distinct offenses not charged here:  an issuer's failure to file certain reports and other documents; and other specified violations by issuers, officers, directors, stockholders, employees or agents of issuers.  15 U.S.C. § 78ff(b), (c).  The indictment plainly charges a securities fraud scheme and willful violations of the securities laws within the framework of § 78ff(a).  That puts the lie to Gentile's claim that he was not charged with a crime for which he agreed to toll the statute of limitations and to which the Dodd-Frank Act applies.

It also eviscerates his related claim that the indictment does not provide sufficient notice under Federal Rule of Criminal Procedure 7(c)(1).  Rule 7(c)(1) requires an indictment to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged" and, to give "for each count … the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  The indictment in this case satisfies these core requirements.  But even if the indictment were technically deficient, that would not be grounds to

---

[4]  Gentile also contends in a footnote that Section 78ff(a) is merely a "penalty provision" that provides "enhanced penalties" for violations of the securities laws, and "is not a substantive crime, in and of itself."  (Def. Br. at 24, n. 13).  He argues that Section 78ff(a) "cannot stand alone" and can only be applied with other substantive offenses and, according to him, all other offenses in the indictment are time barred.  (*Id.*)  This is incorrect.  Section 78ff(a) is the key provision of Title 15 that creates criminal liability for certain violations of the securities laws and, thus, is not merely an "enhanced" penalty provision.  *See also* 18 U.S.C. § 3301(a)(2) (defining "securities fraud offense" to include a violation of 15 U.S.C. § 78ff(a)).  Further, Gentile's waivers (and § 3301) cover conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and that charge is included in the indictment.  Accordingly, Gentile's attacks on Section 78ff(a) are meritless and, in any event, they have no application to the conspiracy charge.

dismiss it "unless the defendant was misled and thereby prejudiced," which is not the case here.  *See* Fed. R. Crim. P. 7(c)(1).

Even if dismissal were warranted, the Government could seek a superseding indictment to specify that he is charged under § 78ff(a) specifically, not § 78ff generally.  Since the original indictment was timely filed, it effectively tolled the statute of limitations before it expired.  Thus, a superseding indictment making such a technical correction after the expiration of the limitations period would not be untimely.  *See United States v. Friedman*, 649 F.2d 199, 203-04 (3d Cir. 1981) ("[A] valid indictment tolls the statute of limitations and … return of a superseding indictment prior to the dismissal of the original indictment does not violate the statute of limitations if the superseding indictment does not substantially alter the charge.").  For similar reasons, if this Court were to dismiss the indictment because of this supposed defect in the indictment's charging language, the Government would have six months to obtain another indictment.  *See* 18 U.S.C. § 3288.

**C.    Gentile's Two Statute of Limitations Waivers Did Not Require the Government to Bring Its Charges within the Wrong Limitations Period.**

While cooperating, Gentile signed two separate statute of limitations waivers that unequivocally added a total of twenty-four months to the limitations period.  Nonetheless, he now argues that a provision in the Second Waiver permitting him to assert any available defenses after July 2015 created a "deadline" for the indictment that was not met.  (Def. Br. at 24-28).  Gentile

also claims that the Second Waiver is not enforceable because it was not notarized. (*Id.* at 28-32). Both arguments lack merit.

### i.     The Second Waiver Did Not Create a Deadline for the Government to Indict Gentile.

In July 2013, as the tolling period provided by the First Waiver was nearing its end, Gentile was actively cooperating with various investigations. Rather than force the Government's hand by requiring it to obtain an indictment, Gentile opted to preserve the status quo by signing the Second Waiver on July 31, 2013. (Ford Affidavit, Exhibit G). In it, he "expressly agree[d] to toll any statute of limitations relating to [certain previously identified] sections of the United States Code ... for a period of one year (365 days) commencing on July 31, 2013 and ending on July 31, 2014." (*Id.*). The Second Waiver expressly acknowledged Gentile's "understand[ing] that this time period will be excluded from the calculation of any limitations periods applicable to the filing of any charges relating to the above sections of the United States Code" and that he was "expressly waiv[ing] any right" he had "relating to the statute of limitations or prompt disposition of the charges referred to" in the waiver. (*Id.*). These terms show that Gentile waived all statute of limitations-based defenses that would be viable but for the tolling period, which he understood would be excluded from "any" limitations periods applicable to his case. Nonetheless, Gentile argues that the Second Waiver provided that any charges filed after June 30, 2015 would be time-barred. He relies on paragraph 3 of the Second Waiver, in which he "expressly reserve[d]

22

[his] privilege to assert any right or defense relating to the above-described provisions of the United States Code ... in the event that the [USAO] fails to commence criminal prosecution ... on or before June 30, 2015." (*Id.*).

Gentile asserts that this language mandates that any prosecution against him after June 30, 2015 must be time-barred because that date was an agreed date after which the Government would not be able to prosecute him. (Def. Br. at 26-27). There are two fundamental problems with Gentile's argument, however. First, it improperly turns his unilateral waiver into a bilateral contract. Second, it does not comport with the plain terms of the Second Waiver.

The Second Waiver "was not a contract. It was but a voluntary unilateral waiver of a defense." *United States v. Fischer*, 93 F.2d 488, 489 (2d Cir. 1937) (citations omitted); *see Strange v. United States*, 282 U.S. 270, 276 (1931) ("a waiver is not a contract"); *Rohde v. United States*, 415 F.2d 695, 697 (9th Cir. 1963) ("a waiver is not a contract, but a unilateral relinquishment of a defense"). Thus, the waiver binds only Gentile, not the Government. Nor is there any basis to construe the waiver against the Government, as Gentile demands. That "argument relies heavily upon contractual principles, which ... have no place in determining the validity of the waiver." *United States v. McGaughey*, 977 F.2d 1067, 1073 (7th Cir. 1992).

Moreover, Paragraph 3 of the Second Waiver does not mention any statutes of limitations and does not state that the Government would be barred from prosecuting Gentile after a date certain. Rather, this provision merely

23

states that Gentile "reserves" the right to assert any defenses he may have after June 30, 2015.  If the Government intended to be bound by such a firm deadline, and to waive its ability to prosecute Gentile thereafter, it would have expressly done so in plain terms.  It defies logic that the parties would have agreed to such an important term as a filing deadline for this prosecution and then documented it in such a vague, roundabout way.  If the parties had intended June 30, 2015 to be an enforceable limitation on when this case would be prosecuted, they certainly would have made that intention clear in the document.

Notably, Gentile does not allege that, prior to signing the Second Waiver, either he or his counsel expressed their current view that the Second Waiver created a deadline for that indictment.  Nor could he:  in signing the Second Waiver, Gentile represented that he had agreed to this tolling period "to allow more time for [him] to consider the options available to [him] with respect to the potential charges against [him], and for [his] attorney to confer with representatives of the [USAO]."  Instead, Gentile points to certain (undocumented) statements supposedly made at meetings in February 2014 and on August 14, 2014 (Def. Br. 27-28) about the purported June 30, 2015 deadline.  But any such statements would be irrelevant to his intent at the time he signed the Second Waiver, which occurred many months earlier in July 2013.

Gentile contends that paragraph 3 of the Second Waiver would have no purpose if it is not interpreted as creating a deadline for the Government to

24

commence a prosecution because, without it, he would have been able to assert a statute of limitations defense as soon as the tolling period expired. (Def. Br. at 26-27).  According to Gentile, paragraph 3 was intended to clarify that the statute of limitations did not expire at the end of the tolling period but, rather, eleven months later.  (*Id.*).  But that is not what the Second Waiver says.  Nor is it what that Waiver does.  The Government does not dispute that paragraph 3 was intended to clarify that none of the applicable statute of limitations expired at the conclusion of the tolling period.  However, the July 30, 2015 date referenced in that paragraph is not an all-encompassing deadline for the Government to commence a prosecution against Gentile. Rather, it reflects the earliest date on which Gentile could assert any statute of limitations defenses.

Courts enforce waivers of limitations periods even when the executing parties mistakenly believed that the claims against them were not yet time-barred, so long as that mistake was not deliberately induced by the Government.  *See, e.g.*, *Clifton Mfg. Co. v. United States*, 76 F.2d 577 (4th Cir. 1935).  It stands to reason, then, that those waivers should be equally enforceable where, as here, the executing party may have been mistaken about how long the Government had by statute to press one of its claims.  Although Gentile suggests otherwise, the Government did not cajole, threaten or trick him into signing either Waiver.

To the contrary, the Government acted in good faith in securing two separate statute of limitations waivers from Gentile to preserve the status quo

25

while facilitating Gentile's cooperation.  It was Gentile, not the Government, who requested that the parties hold off on deciding on a final disposition of his case so that he could make a formal presentation for a non-felony disposition to the USAO leadership at the conclusion of his cooperation.  The Government did not make any intentional misrepresentations to Gentile concerning the statute of limitations to induce him to sign the waivers.  Indeed, while irrelevant to Gentile's state of mind at the time he executed the Second Waiver, the fact is that the Government could not have misled him on this point, as it was unaware at that time that § 3301 had extended the securities fraud statute of limitations.  What is important is that both Gentile and the Government had access to the same general information concerning the time period of Gentile's unlawful conduct and the nature of the criminal charges.[5]  Further, Gentile was represented by competent counsel at all times in connection with the waivers.

Under these circumstances, Gentile should not be unjustly shielded from prosecution merely because of a possible mutual mistake in July 2013 regarding the statute of limitations for securities fraud.  Even if Gentile incorrectly believed when he signed the Second Waiver that the *only* limitations period for *all* of the potential offenses listed in the Waiver was five years, that does not foreclose application of § 3301 here.  The Second Waiver expressly

---

[5]  The Government has never contended that Gentile tolled all limitations periods for twenty-three months in each waiver.  (Def. Br. at 27).  Rather, he collectively tolled twenty-four months; twelve months in each waiver.  Those tolling periods, combined with § 3301's six-year limitations period, gave the Government eight years to obtain the indictment.

said that Gentile was agreeing to toll "*any* statute of limitations relating to" the specified offenses. (Emphasis added). "Any" does not mean "the only." Rather, "the language of this waiver is too definite to be ignored or varied by construction." *S.S. Pierce Co. v. United States*, 93 F.2d 599, 601 (1st Cir. 1937). Thus, Gentile's waiver "is not limited to" § 3282(a) "and included rights under" § 3301 "as well." *Id.* Indeed, even had there been only *one* statute of limitations in effect when Gentile signed the Second Waiver and the Dodd-Frank Act extended the limitations period for one of the specified offenses afterwards, the waiver would still have tolled that extended limitations period. *See, e.g.*, *Behren v. United States*, 82 F.3d 1017, 1019 (8th Cir. 1996).

Nor can Gentile argue that his Waivers were unknowing or involuntary. To begin with, he has not made that argument in his opening brief, and should not be allowed to raise it in his reply. *Cf. United States v. Pellullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."). Moreover, Gentile does not allege that he or his counsel ever told the Government before executing the Second Waiver that he wanted to ensure a resolution to any criminal charges by the June 30, 2015 date in paragraph 3 or that he believed that paragraph had that effect. And Gentile's motion makes clear that he did not begin expressing concerns about the timing of any such resolution until the summer of 2014, roughly a year after he signed the Second Waiver. (Def. Br. at 15).

27

In sum, the Second Waiver bound only Gentile, not the Government, and its express terms show that the Government did not agree to a deadline by which to prosecute Gentile or to a specific expiration date for the statute of limitations. Accordingly, this Court should enforce both Waivers.

### ii.   Waivers Need Not Be Notarized to Be Enforceable.

Gentile's final line of attack against the Second Waiver is that it was not notarized. According to Gentile, this makes it a "legal nullity" that carries "no legal effect in this matter." (Def. Br. at 28-29). Nonsense. Gentile does not dispute that he signed the Second Waiver confirming his agreement to and understanding of all of its terms, and his counsel transmitted it to the Government. There is no requirement that a statute of limitations waiver, or any other similar waiver, be notarized. Indeed, plea agreements, waivers of indictment, and other documents containing standard waivers in criminal cases are routinely signed and enforced without being notarized.

Gentile provides no authority for the proposition that a statute of limitations waiver must be notarized to be enforced. Instead, he cites statutes, rules and cases that address the admissibility into evidence of affidavits under certain circumstances. (Def. Br. at 29, citing, *e.g.*, 28 U.S.C. § 1746; Fed. R. Civ. P. 56(c), (e)). But these authorities are irrelevant here because the Government does not seek to admit into evidence at trial Gentile's statute of limitations waivers. The lack of a notary signature on the Second Waiver is meaningless. And unlike the waiver agreement in *United States v. Spector*, 55 F.3d 22 (1st Cir. 1995), which was a true contract and "provided that it would

28

be effective 'upon execution by all parties'" and could be extended "only by a further writing signed by all parties[,]" *id.* at 23–24, neither Waiver expressly said that it had to be notarized before it could be effective. Because there is no dispute that Gentile signed the Second Waiver, this Court should reject his plea to elevate form over substance.

## II.   Gentile Cannot Establish a Violation of the Sixth Amendment's Speedy Trial Provision.

Gentile contends that the Government violated his Sixth Amendment right to speedy trial which, according to him, "was triggered by his arrest, restriction of liberty, public accusation, and anxiety," and existed throughout the entire time period of his cooperation. (Def. Br. at 32). Gentile claims that the delay between his arrest in July 2012 and the indictment in March 2016 results in a constitutional violation that mandates dismissal of this case. These arguments have no merit.

The Sixth Amendment's speedy trial provision did not apply (but for the first weekend of Gentile's cooperation) because the Government dismissed the complaint shortly after his arrest. During the period of alleged "delay," Gentile was not under indictment, was not incarcerated, was not facing prosecution and, most importantly, was not seeking a criminal trial. Instead, he continuously sought to delay any such prosecution until the completion of his cooperation, which spanned several years. The Sixth Amendment's speedy trial right has no application under these circumstances.

Instead, Gentile's complaints about pretrial delay must be reviewed under the Fifth Amendment's Due Process Clause. But Gentile cannot

29

establish a due process violation because his desire to cooperate with the
Government rather than dispute the charges caused the delay.  Accordingly,
any minimal prejudice he may have suffered as a result is substantially
outweighed by the benefits he realized.

### A.   Gentile Had No Sixth Amendment Speedy Trial Right While No Charges Were Pending.

The Sixth Amendment provides that "in all criminal prosecutions, the
accused shall enjoy the right to a speedy and public trial[.]"  *Betterman v.
Montana*, 136 S. Ct. 1609, 1612 (2016).  On its face, "the protection of the
Amendment is activated only when a criminal prosecution has begun and
extends only to those persons who have been 'accused' in the course of that
prosecution."  *United States v. Marion*, 404 U.S. 307, 313 (1971); *see
Betterman*, 136 S Ct. at 1613 (noting that the Sixth Amendment's speedy trial
clause only applies "from arrest or indictment through conviction.").  As such,
the right does not apply to allegations of pre-charge delay.  *Id.*; *see United
States v. Lovasco*, 431 U.S. 783, 788 (1977); *Marion*, 404 U.S. at 320.

Likewise, the Sixth Amendment's speedy trial provision "has no
application after the Government, acting in good faith, formally drops charges."
*United States v. MacDonald*, 456 U.S. 1, 9 (1982).  Indeed, "[o]nce charges are
dismissed, the speedy trial guarantee is no longer applicable."  *Id.*  At that
point, "the formerly accused is, at most, in the same position as any other
subject of a criminal investigation."  *Id.*  As such, "any undue delay after
charges are dismissed, like any delay before charges are filed, must be

30

scrutinized under the Due Process Clause, not the Speedy Trial Clause." *Id.*; *see United States v. Colombo*, 852 F.2d 19, 23–24 (1st Cir. 1988) (holding that Sixth Amendment Speedy trial right does not apply after the government dismisses an indictment that it intends to refile in another district).[6]

In *MacDonald*, the Court reversed the Fourth Circuit's dismissal on speedy trial grounds of a murder conviction obtained by the Justice Department following the dismissal of charges by the United States Army. *Id.* at 9. Citing *Marion*, the Court disagreed with the Fourth Circuit's implicit holding that "criminal charges were pending against MacDonald during the entire period between his military arrest and his later indictment on civilian charges." *Id.* Instead, the Court held, the Army's dismissal of its charges against MacDonald, less than a year after the crime was committed, meant that there was *no pending criminal prosecution* on which he could have been tried until the civilian grand jury returned its indictment four years later. *Id.* (emphasis added).

Here, Gentile was charged by criminal complaint on June 25, 2012. The complaint was filed under seal and was not unsealed until Gentile was arrested

---

[6] Gentile does not raise such a Due Process claim. Doubtless that is because he cannot possibly meet the stringent standard governing such claims. To prevail, he would have to show: "(1) that the delay between the crime and the federal indictment actually prejudiced his defense; and (2) the government deliberately delayed bringing the indictment in order to obtain an improper tactical advantage or to harass him." *United States v. Beckett*, 208 F.3d 140, 150-51 (3d Cir. 2000). Absent such a showing, the defendant cannot invoke the "extreme sanction of dismissal" of an indictment under the Due Process Clause. *Id.* (citing *United States v. Sebetich*, 776 F.2d 412, 430 (3d Cir. 1985)). Gentile does not allege, and there would be no evidence to suggest, that the Government deliberately delayed charging him to "gain an advantage over him." *Id.*

on Friday, July 13, 2012.  The complaint was dismissed the following Monday,
July 16, 2012, pursuant to an order entered under seal.  From that Monday
through the date of the indictment, Gentile did not have a Sixth Amendment
right to a speedy trial because, like in *MacDonald*, there was "*no pending
criminal prosecution* on which he could have been tried until the grand jury
returned its indictment" on March 23, 2016.  *MacDonald*, 456 U.S. at 9.

Despite these firmly-rooted principles, Gentile argues that the Sixth
Amendment's speedy trial provision survived the dismissal of the complaint
and existed through the entire time period of his cooperation because,
according to him, he suffered "deprivations of his liberty," "public disclosure of
his arrest and cooperation" and "curtailment of his rights of association and
free speech."  (Def. Br. at 36).  He claims that these circumstances distinguish
this case from *MacDonald*.  (*Id.*at 37).  "[T]hat distinction, however, flies in the
face of the opinion itself: *MacDonald* holds that the speedy trial right simply
does not attach to one not formally accused."  *Colombo*, 852 F.2d at 24.  The
Court's jurisprudence regarding the Sixth Amendment's attachment is clear:
the speedy trial right is charge-specific and exists only when formal criminal
charges are pending.

Moreover, Gentile exaggerates the scope of the so-called restrictions on
his liberty.  For instance, he points to the limited bond conditions that the
Government requested from him in the beginning of his cooperation – namely,
unsecured appearance bonds and limited travel restrictions.  (Def. Br. at 36).
But Gentile does not allege that he was required to post money or property to

32

secure the bond or that those conditions actually caused him or his parents harm beyond mere inconvenience.  Moreover, the limited travel restrictions to which Gentile agreed did not prevent him from operating full-service brokerage firms in New York and the Bahamas and taking numerous international trips for personal and business purposes.

Gentile also notes that, during the first year of his cooperation, he worked with the Government on "an almost full-time basis" and that the Government "controlled his life."  (Def. Br. at 36).  While Gentile's cooperation was extensive, it was completely voluntary; he was free to stop at any point and request a disposition of the charges previously filed against him (or to make a presentation to the USAO's leadership, which he eventually did in 2014 and 2015).  He cooperated because he thought it would benefit him – not for any other reason.

Simply put, any interference with one's liberty that accompanies long-term proactive cooperation with law enforcement is not cognizable under the Sixth Amendment's speedy trial provision because, as explained above, that provision is directed at protecting against excessive pretrial detention and unreasonable delays in bringing a case to trial.  *Betterman*, 136 S. Ct. at 1614.  For those reasons, courts have consistently enforced the Sixth Amendment's speedy trial right in cases in which the defendant was facing an active criminal prosecution and was in an adversarial posture with the Government, not cases in which the defendant was cooperating with the Government for his or her

33

own benefit.[7]  *See United States v. Battis*, 589 F.3d 673 (3d Cir. 2009); *Hakeem v. Beyer*, 990 F.2d 750 (3d Cir. 1993); *United States v. Durham,* 413 F.2d 1003, 1004 (5th Cir. 1969); *Pitts v. North Carolina,* 395 F.2d 182, 185 n. 3 (4th Cir. 1968); *United States v. Feinberg*, 383 F.2d 60, 65 (2d. Cir. 1967).

In addition, Gentile urges the Court to apply the Sixth Amendment's speedy trial provision here because, according to him, he was exposed to "public accusation." (Def. Br. at 37).  Gentile claims that the criminal complaint, albeit dismissed, was visible in certain law enforcement databases and that precluded him from renewing a firearms license in March 2015.  (*Id.*).  But the fact that Gentile was unable to renew a firearms license, or that his cooperation may have been "leaked" to local media outlets in Putnam County, New York, as he claims, does not suggest that he was subject to public accusation because, again, he was not facing formal criminal charges during that time.  (*Id.* at 37-38); *see Colombo*, 852 F.2d at 22 ("Since a person who is 'between indictments' is no longer the subject of public accusation, we do not count the time between indictments in assessing the length of time one has been 'accused.'").

---

[7]  In arguing that he was prejudiced by the Government's alleged delay, Gentile notes that courts in the Second Circuit have held that criminal defendants do not forfeit their speedy trial rights when they decide to cooperate and/or engage in plea discussions with the Government.  (Def. Br. at 41).  He cites *United States v. Robert*, 515 F.2d 642, 647 (2d Cir. 1975), *United States v. Buffalo Amusement Corp.,* 600 F.2d 368, 378 (2d Cir. 1979), and *Bulgin v. State*, 912 So. 2d 307, 311 (Fla. 2005).  But these cases are irrelevant here: in each case, the defendant was under indictment and pending trial during the plea negotiations with or cooperation by the defendants.  Thus, those cases presented the typical pre-trial, post-indictment delays that are commonly adjudicated in cases implicating the Sixth Amendment.

More fundamentally, Gentile was not "publicly accused" until the indictment was returned in March 2016.  The very purpose of dismissing the complaint was to preserve Gentile's ability to cooperate and prevent public disclosure of the criminal charges – had Gentile been "publicly accused," as he now claims, his viability as a cooperator would have been compromised at the outset.  Gentile's successful, covert cooperation for over two years proves he was not publicly accused.

Gentile nevertheless relies on *Klopfer v. State of North Carolina*, 386 U.S. 213 (1967), a case that involved "an unusual North Carolina criminal procedural device known as the '*nolle prosequi* with leave,'" which permitted a prosecutor to terminate criminal proceedings against a defendant without dismissing the indictment, resulting in an indefinitely postponed prosecution. *Id.*  The Supreme Court found that that procedure violated the defendant's right to a speedy trial under the Sixth Amendment because it permitted the criminal action to remain pending, which could "subject [the defendant] to public scorn and deprive him of employment, and almost certainly will force curtailment of his speech, associations and participation in unpopular causes." *Id.* at 222.

Here, in contrast, Gentile has not been exposed to an indefinite, public charging instrument or any of the accompanying prejudices.  Moreover, the defendant in *Klopfer* demanded at the outset a trial and resolution of the criminal charges before the prosecutor implemented that "*nolle prosequi* with leave" process.  *Id.* at 218.  Gentile, in contrast, supported the dismissal of the

35

complaint for the very purpose of allowing him to cooperate.  As such, *Klopfer* does not support Gentile's position.

Accordingly, the only delays in this case that the Sixth Amendment recognizes are the few days that passed between Gentile's arrest and the dismissal of the complaint, and the approximately six months that have passed since the indictment was filed.  Gentile is not challenging either of those delays.  Nor could he.  Pretrial delays of less than one year generally are "not unreasonable enough to trigger the [Sixth Amendment] inquiry."  *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992).[8]

### B.   Even if the Sixth Amendment's Speedy Trial Provision Applies, Gentile Cannot Establish a Violation Under the *Barker v. Wingo* Factors.

In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court set forth four factors that courts must consider in assessing pretrial speedy trial claims under the Sixth Amendment.  Those factors are: (1) the length of the delay; (2)

---

[8]  In addition to his Sixth Amendment claims, Gentile argues that the Government violated the Speedy Trial Act of 1974, 18 U.S.C. § 3161, *et. seq.* (the "Act"), during the time period of his cooperation because, according to him, none of the Act's enumerated periods of excludable delay applied during that time.  (Def. Br. at 35).  This argument is meritless and Gentile has not cited any authority to support it.  That is because the Act's requirement for obtaining an indictment within thirty days of a defendant's arrest, 18 U.S.C. § 3161(b), "applies *only* where, at the time of indictment, the charge upon which a defendant was arrested and upon which a complaint was issued is *still pending.*"  *United States v. Krynicki*, 689 F.2d 289, 293 (1st Cir. 1982) (emphasis in original); *United States v. Hillegas*, 578 F.2d 453, 459-60 (2d. Cir. 1978) ("[U]pon a voluntary dismissal of a complaint the period thereafter up to the filing of an indictment should be excluded, if not disregarded entirely pursuant to [the Speedy Trial Act].").  In any event, the indictment charges conspiracy to commit securities fraud and securities fraud, whereas the complaint charged conspiracy to commit wire fraud.  Since "the Speedy Trial Act requires the dismissal of only those charges that were made in the original complaint that triggered the thirty-day time period," Gentile would not be entitled to relief even if § 3161(b) applied during the time period of his cooperation.  *United States v. Oliver*, 238 F.3d 471, 473 (3d Cir. 2001).

the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Id.* at 530. A review of those factors clearly demonstrates that Gentile's Sixth Amendment claims have no merit.

<u>Length of Delay</u>

Gentile voluntary cooperated with the Government during the majority of the time period about which he now complains, and he signed two statute of limitations waivers to ensure the Government did not prosecute him during that time. At most, the starting point for evaluating any purported delay should be the date the Government informed Gentile that it would not agree to a non-felony disposition - in or around July 2015. Prior to that date, Gentile either was cooperating with the Government or making efforts to negotiate a resolution of his criminal charges. Either way, he was not pursuing a speedy trial. The Government obtained an indictment less than one year later.

<u>Reasons for Delay</u>

Gentile contends that the "sole reason" for the delay was the Government's desire to use him as a cooperator, and that the Government "induced" his ongoing cooperation by "disingenuously dangling before [him] the prospect of first a non-felony resolution, and ultimately a non-prosecution." (Def. Br. at 40). This simply is not true. At the time of his arrest, Gentile, guided by experienced criminal defense counsel, quickly decided to cooperate with law enforcement rather than pursue a speedy resolution of the pending criminal charges. Gentile's only goal from that point forward was to cooperate with the Government in as complete a fashion as he could, and to push off any

37

potential prosecution against him for as long as possible.  Because Gentile requested the opportunity to cooperate at the outset, acquiesced in having the criminal charges dropped to facilitate his cooperation, and agreed twice to toll the statute of limitations to extend his period of cooperation, he cannot attribute any delay while he cooperated to the Government.  This factor heavily weighs against Gentile.

Assertion of the Right

A defendant's "failure to assert the right will make it difficult for [him] to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 528.  Courts have emphasized the need for a defendant to show he "vigorously pursued a speedy trial." *Beyer*, 990 F.2d at 764 (citing *United States v. Koller*, 956 F.2d 1408, 1414 (7th Cir. 1992)).

Here, Gentile never "vigorously pursued a speedy trial" or indicated in any manner a desire for a trial.  Rather, as his actions demonstrate, he sought to continue to cooperate for several years based on the slim hope that he might convince the leadership of the USAO to accept a non-felony disposition.  For this reason, Gentile concedes that he did not pursue a speedy trial for the overwhelming majority of time from his arrest to his indictment.  He first asserted the right in September 2015, after the USAO informed his counsel for a second time that it would not agree to a non-felony disposition.  (Def. Br. at 43).  Only then did Gentile first contend that the Government had already violated his Sixth Amendment right to a speedy trial.  But Gentile must show that he asserted his right to a speedy trial and was ready and willing to go to

38

trial during the period of delay.  *See Beyer*, 990 F.2d at 764.  This he cannot

do.  Because Gentile never demanded a speedy trial, this factor strongly weighs

against him.

Prejudice

Gentile also has not demonstrated any prejudice flowing from the alleged

delays.  He was not detained during the time period of his cooperation (or at

any time, except for the weekend between his arrest and the dismissal of the

complaint), so he did not suffer prejudice from pretrial incarceration.

Moreover, his ability to defend himself has not been hampered in any way.

While he vaguely asserts prejudice based on his purported lack of access to

"essential financial records," he does not specifically identify any such records.

(Def. Br. at 44-45).  In any event, Gentile orchestrated many of the key aspects

of the scheme using his broker-dealer in New York and numerous financial

accounts that he owned or controlled.  As such, many of the relevant records in

this case likely are in Gentile's possession or under his control.

Further, Gentile's vague arguments that witnesses may lose their

recollections of the relevant events are insufficient because "general allegations

that witnesses' memories have faded are insufficient to create prejudice."

*Beyer*, 990 F.2d at 763.  Likewise, Gentile's amorphous complaints of "anxiety"

are similarly flawed because "vague allegations of anxiety are insufficient to

state a cognizable claim."  *Id.* at 762.  Rather, the defendant "must produce

evidence of psychic injury."  *Id.*  Gentile has not done so.  Lastly, there is no

basis for Gentile's claim that a presumption of prejudice should apply here due

39

solely to length of the alleged delay because, as noted, Gentile caused or, at the very least, contributed to the delay by requesting the opportunity to cooperate and doing so for years in an effort to avoid being prosecuted. (Def. Br. at 44).

Accordingly, the Court should reject Gentile's speedy trial arguments.

## III. Gentile's Due Process Claims Fail Because the Government Never Promised Him That it Would Not Prosecute Him in Exchange For His Cooperation.

Gentile's final attack on the indictment raises due process claims based on alleged promises by the Government that simply did not occur. First, Gentile contends that he and the Government formed a binding (but utterly undocumented) agreement that the Government would not prosecute him in exchange for his continued cooperation. (Def. Br. at 49). Second, Gentile claims that principles of "fundamental fairness" require dismissal of the indictment. Both claims lack merit.

### A. The Government Never Promised Gentile, Implicitly or Explicitly, that it Would Not Prosecute Him in Exchange for His Cooperation.

A "defendant who claims that he has received transactional immunity asserts, in essence, the existence of an agreement not to prosecute." *United States v. Jimenez*, 256 F.3d 330, 347 (5th Cir. 2001). "Applying contract law, the defendant bears the burden of proving that there was a mutual manifestation of assent - either verbally, or through conduct - to the agreement's essential terms." *Id.*; s*ee United States v. McHan*, 101 F.3d 1027, 1034 (4th Cir.1996) (citing Restatement (Second) of Contracts § 19 (1979)). "The court must evaluate both subjective and objective factors in determining

40

whether the defendant has carried his burden." *Jimenez*, 256 F.3d at 347. But a defendant's "subjective belief cannot, by itself, establish transactional immunity." *Id.* at 348 n.25. "[C]ases of disappointed but unfounded expectations must be carefully distinguished from those in which the defendant's expectations ... are predicated upon promises by the Government[.]" *United States v. Badaracco*, 954 F.2d 928, 939 (3d Cir. 1992); *see United States v. Crusco*, 536 F.2d 21, 24 (3d Cir. 1976).

From the date of Gentile's arrest through the end of his cooperation, the Government made only one pertinent promise to him – that it would give him the opportunity to make a formal presentation to the USAO's leadership before making a final charging decision. The Government lived up to its end of the agreement by convening not just one, but two, meetings between Gentile's lawyers and the USAO's leadership in 2014 and 2015, at which Gentile received a full and fair opportunity to request a non-felony disposition.

Nonetheless, Gentile now claims that, after two years of cooperation, during which he and his counsel understood that a non-felony disposition was highly unlikely (*see* Ford Letter at 1-2, confirming that understanding), "[t]he Government and Mr. Gentile entered into a binding agreement, the terms of which were that if Mr. Gentile continued to cooperate beyond the fall of 2014 and . . . beyond December 18, 2014, he would not be charged with a felony." (Def. Br. at 49). In support of this argument, Gentile points to a series of meetings and alleged conversations that occurred between August 2014 and December 2014, and to his continued cooperation between December 2014 and

41

June 2015.  Gentile's claims are unfounded and contrary to his counsel's own admissions.

In particular, in or around August 2014, Gentile was cooperating in a significant ongoing securities fraud investigation.  As reflected in defense counsel's letter, the Government made clear to Gentile in an August 2014 meeting that he could stop cooperating at any time, and that the Government could not provide him any assurances as to how his criminal charges might be resolved.  In the face of this, Gentile elected to continue to cooperate, despite the absence of any assurances.

Gentile contends that at some point after mid-October 2014, an AUSA involved in this matter made a comment to his counsel indicating that Gentile would not be prosecuted if he continued to cooperate.  (Def. Br. at 49).  The Government contests that the AUSA made such a comment.  Further, the conduct of the parties prior to, during and after the time period of this alleged comment demonstrates that the USAO never promised not to prosecute Gentile.

Gentile also claims that his counsel informed the USAO during a meeting with its leadership on December 18, 2014 that Gentile "no longer wanted to cooperate unless he was formally assured that he would not be charged at the conclusion of his cooperation," and that, after that meeting, "the Government simply continued to use Mr. Gentile as a cooperator[.]" (Def. Br. at 50).  Gentile argues that by continuing his cooperation after this meeting, the Government implicitly agreed not to prosecute him.  This claim is simply untrue.

42

As an initial matter, Gentile's counsel did not make any blanket assertions at the meeting with the USAO leadership that Gentile would not continue to cooperate in the absence of a formal non-prosecution or similar agreement with the Government.  While counsel sought a non-felony disposition, and indicated that his client had no further incentive to cooperate, he never conditioned any further cooperation on the USAO's commitment to a non-felony disposition.  The USAO took Gentile's request under advisement at that meeting, and it was clear that the final charging decision was up to the leadership of the USAO.

Additionally, Gentile's work with the FBI after the December 18, 2014 meeting was limited in scope and duration.  Notably, at the time of this meeting, Gentile was already deeply involved in the securities fraud investigation that was the subject of the August 2014 meeting referenced above; he had already engaged in consensually recorded meetings in the Bahamas with the target of that investigation, and numerous consensually recorded calls.[9]  All parties understood prior to the December 18, 2014 meeting that Gentile's cooperation in that matter would not be interrupted while he and the USAO discussed the final charging decision.  This belies Gentile's current efforts to portray his post-meeting cooperation on that matter as reflecting

---

[9] Gentile references this meeting in the Bahamas in the section of his brief in which he alleges that his cooperation after the December 18, 2014 meeting at the USAO establishes that the Government had agreed not to prosecute him.  (Def. Br. at 50).  But this meeting in the Bahamas (and several other investigative actions by Gentile relating to that matter) occurred in August 2014, several months *before* the December 18, 2014 meeting at the USAO.

some unstated agreement by the USAO not to charge him with a felony. Likewise, Gentile's sporadic and limited assistance in a handful of other unrelated investigations between January and June 2015 did not evidence an agreement that the Government would not prosecute him.

In short, Gentile asks the Court to accept that, after years of cooperating without any agreement that he would receive a non-felony disposition, he was able to persuade the USAO leadership not to prosecute him, and the USAO chose to convey that momentous decision to him not in words, not in writing, but solely by implication through its actions. It is preposterous that anyone – let alone sophisticated defense counsel – would rely solely on the conduct of prosecutors and agents to confirm that such an important decision had been made, rather than documenting the decision or even discussing it with someone – anyone – from the USAO. Yet that is what Gentile's argument comes down to. It makes no sense, and that is because it did not happen. For these reasons, the Court should reject Gentile's contentions that he had a binding agreement with the Government that he would not be prosecuted.

**B.    Gentile's Fundamental Fairness Arguments Have No Merit.**

Gentile also claims that FBI agents "assured him, in no uncertain terms, that he would not be prosecuted in exchange for his efforts." (Def. Br. at 54). He argues that he is entitled to dismissal of the indictment under the Due Process Clause based upon principles of fundamental fairness. (*Id.* at 52). These arguments have no merit.

44

The Third Circuit has "repeatedly" noted that it is "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." *United States v. Christie*, 624 F.3d 558, 572–73 (3d Cir. 2010). "For the defense to apply, the Government's conduct must have rendered the prosecution of the defendant fundamentally unfair." *United States v. Lakhani*, 480 F.3d 171, 181 (3d Cir. 2007). Thus, a court should not dismiss an indictment "each time the government acts deceptively or participates in a crime that it is investigating." *United States v. Nolan-Cooper*, 155 F.3d 221, 231 (3d Cir. 1998) (quotation marks omitted). Instead, "the challenged conduct must be shocking, outrageous, and clearly intolerable." *United States v. Barbosa*, 271 F.3d 438, 469 (3d Cir. 2001).

As the Third Circuit has recognized, "the viability of the doctrine is hanging by a thread" and it may be "'moribund'" because, "in practice, courts have rejected its application with almost monotonous regularity." *Nolan-Cooper*, 155 F.3d at 230 (quotation marks omitted). Indeed, in 40 years, the Third Circuit has found "government action" to be "so outrageous as to violate defendants' due process rights" only twice: "in *United States v. West*, 511 F.2d 1083 (3d Cir. 1975), and *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978)." *United States v. Driscoll*, 852 F.2d 84, 86 (3d Cir. 1988).

On *every* other occasion, the Third Circuit has rejected the claim. *E.g.*, *United States v. Hoffecker*, 530 F.3d 137, 152–56 (3d Cir. 2008); *United States v. Voigt*, 89 F.3d 1050, 1063–70 (3d Cir. 1996); *United States v. Gonzales*, 927 F.2d 139, 142–45 (3d Cir. 1991); *United States v. Gambino*, 788 F.2d 938, 945

45

n.6 (3d Cir. 1986).  No wonder: even if *West* and *Twigg* remain good law, *see United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983) (per curiam); *United States v. Jannotti*, 673 F.2d 578, 610 n.17 (3d Cir. 1982) (en banc), they presented extraordinary circumstances.

In *West*, the Third Circuit "found that the government's conduct in having its agent suggest a narcotics sale to the defendant, providing the source of supply for the drug, and arranging for its sale to another agent, although the defendant had no 'prior inclination to engage in this evil business,' had 'passed the point of toleration.'" *Driscoll*, 852 F.2d at 86 (quoting *West*, 511 F.2d at 1086, 1085).  And in *Twigg*, "the government suggested that defendant join in establishing a methamphetamine laboratory and then supplied him with essential materials, equipment, technical expertise, and a site." *Driscoll*, 852 F.2d at 86.  Judging "this conduct in light of the fact that at the time the defendant 'was lawfully and peacefully minding his own affairs,'" the Third Circuit "concluded that 'fundamental fairness'" barred the prosecution.  *Id.* (quoting *Twigg*, 588 F.2d at 381).

That is not this case.  Indeed, even if Gentile's allegations were accepted at face value, they do not remotely approach the kind of conduct that has been found *not* to be outrageous government conduct.  *See, e.g., Lakhani*, 480 F.3d at 182 (no outrageous government conduct where government agent initiated illicit arms deal, and government was both buyer and seller of the arms); *Nolan-Cooper*, 155 F.3d at 224 (no outrageous government conduct where government agent wined, dined and had sex with target); *Beverly*, 723 F.2d at

46

11–13 (no outrageous government conduct where informant solicited defendants to burn down government-owned building, and government agent purchased gasoline, gasoline can and disguises for defendants and drove them to the building).  It certainly does not match the "quite egregious" government "overinvolvement" in *Twigg*. *Nolan-Cooper*, 155 F.3d at 230.  In short, nothing Gentile alleges could properly be described as "outrageous."

Gentile does not even address, let alone attempt to satisfy, the extremely high burden required to obtain relief under the Due Process Clause based upon the alleged misconduct of law enforcement agents.  Instead, he relies on two out-of-circuit cases, *United States v. Pascal*, 496 F. Supp. 313 (N.D. Ill. 1979), and *United States v. Carrillo*, 709 F.2d 35 (9th Cir. 1983), which involved circumstances far different from those here.

In *Pascal*, DEA agents arrested the defendant at the airport after discovering narcotics in his possession and promised the defendant that if he cooperated, the DEA would advise the US Attorney's Office of his cooperation. *Id.* at 314.  The defendant cooperated for several months in reliance on this agreement, but the DEA never advised the US Attorney's Office of that cooperation and it later obtained an indictment against the defendant.  *Id.* at 315-17.  The defendant moved to dismiss the indictment and, in response, the government agreed that the DEA had made a promise to the defendant and had broken that promise.  *Id.* at 317.  The only issue in dispute was the remedy; the government sought dismissal of the indictment without prejudice.  *Id.* However, the court concluded that dismissal with prejudice was the only

47

appropriate remedy to cure the damage caused by certain agents of the DEA. *Id.* at 320.

This case is nothing like *Pascal.* Here, the USAO was involved in Gentile's cooperation from the very beginning, making clear to him and his counsel all along that a non-felony disposition was highly unlikely. The FBI agents were supportive of Gentile's cooperation and satisfied with the results, but Gentile always understood that the decision whether to charge him with a felony rested solely with the USAO. Further, the Ford Letter confirms the absence in this case of the miscommunication (or complete lack of communication) that occurred in *Pascal* between the DEA and the U.S. Attorney's Office. In the Ford Letter, counsel acknowledges that Gentile had cooperated for two years "despite the absence of any assurance as to how this matter might end for him." (Ford Letter, at 1-2).

*Carrillo* is similarly distinguishable. There, the DEA arrested the defendant for possession of heroin but then promised that he would not be prosecuted if he cooperated against other narcotics targets. 709 F.2d at 35. The defendant agreed, but stated that he did not want to testify. *Id.* Although the defendant was illiterate, the DEA required him to sign a form memorializing his agreement to cooperate, including to testify if necessary. *Id.* at 36. The defendant was later subpoenaed to testify in a case in which he had cooperated, but he refused. *Id.* The government subsequently indicted him based on a breach of the cooperation agreement arising from his refusal to testify. *Id.* In granting the defendant's motion to dismiss the indictment, the

48

district court found that there were "no meetings of the minds" regarding the defendant's supposed agreement to testify because the defendant was illiterate and could not understand the document that he signed when he agreed to cooperate. *Id.* at 37. The Court of Appeals affirmed that fact-based determination, finding that it was not clearly erroneous. *Id.*

Unlike *Carrillo* where it was undisputed that the government initially had agreed not to prosecute the defendant, the Government in this case never reached a non-prosecution or similar agreement with Gentile. As a result, principles of fundamental fairness do not warrant dismissal in this case as they did in *Carrillo*.

Further, the FBI's alleged representations cited by Gentile cannot create such an agreement when Gentile understood that the FBI did not have authority to make any such agreement. Indeed, "unless plea bargain promises to a criminal defendant are specifically authorized, the government is not bound by those promises, except in unusual circumstances." *LaPorta v. United States*, 651 F. Supp. 884, 890 (E.D. Pa. 1986) (citing *United States v. Hudson*, 609 F.2d 1326, 1328-29 (9th Cir. 1979)) (prosecution not bound where Secret Service agent alleged to have made unauthorized promise to defendant and the defendant incurred no detriment in reliance on promise); *United States v. Lombardozzi*, 467 F.2d 160, 162 (2d Cir. 1972) (prosecution not bound where FBI agent convinced defendant that agent spoke for the prosecution and made assurances of concurrent federal and state sentences that did not amount to a promise, and where the defendant knew agent could not bind prosecution).

49

Because a law enforcement agent generally "is not part of the 'prosecution team,' ... any statement made by [such agent] constituting a 'promise' would not bind the prosecutor." *Id.*

Lastly, even if the Court finds that FBI agents made promises to Gentile, Gentile did not rely on those promises to his detriment.  There can be no credible dispute that until October 2014, Gentile understood that the Government had not promised that he would receive a non-felony disposition. His experienced criminal defense counsel admitted that he had cooperated for years without any assurances or promises of a particular outcome (*see* Ford Letter at 1-2).  As such, to the extent Gentile ever began thinking that a non-felony disposition was realistic, that expectation, however unfounded and incredible, could not have arisen until the Fall of 2014 and early 2015.  It cannot be said that after years of cooperation without any assurances as to the outcome, Gentile in late 2014 and early 2015 somehow relied to his detriment on alleged FBI representations.  *See Hudson*, 609 F.2d at 1328 ("Where a federal agent is alleged to have made a promise clearly outside his authority and the defendant has incurred no detriment in reliance on this promise, fundamental fairness does not require that the United States Attorney abide by the agent's promise.").

The Court should reject Gentile's Due Process claims.

## IV. The Court Should Deny the Bulk of Gentile's Arguments Without a Hearing.

For the reasons set forth above, the Court can and should reject Gentile's arguments referenced in sections I., II. and III.B. above without a hearing.  The

statute of limitations arguments and the speedy trial claims are not based on any contested facts, and the Court can summarily dispatch them based solely on the controlling principles of law.

Likewise, Gentile's fundamental fairness argument about the purported conduct of the FBI agents can be addressed without a hearing because it is belied by the admissions in the Ford Letter.  That letter demonstrates conclusively that Gentile always knew the decision whether to prosecute him was in the sole discretion of the USAO, not the FBI.  Moreover, even if the Court were to accept as true the defendant's assertions, the inescapable fact is that they do not come remotely close to meeting the standard required by the Third Circuit for relief.

Finally, the Government notes that the arguments addressed in section III.A. above regarding a supposed agreement by the USAO not to prosecute him are contradicted by defense counsel's admissions and defy common sense. That said, the Government suggests that the Court hold a limited evidentiary hearing on that issue, focused on the actions and statements after the date of the Ford Letter.  Gentile would have the burden of proof at any such hearing, and would be required to prove that there was some non-prosecution agreement reached in that time period.  *See United States v. Pelullo*, 399 F.3d at 209 (defendant must prove a *Brady* violation to obtain relief).

## CONCLUSION

For the reasons set forth above, the Court should deny Gentile's motion to dismiss the indictment.  Specifically, the statute of limitations and speedy trial issues should be denied without a hearing, as should the due process claims based on the conduct of FBI agents.  The Court should hold a limited evidentiary hearing, as outlined above, on the question of whether the USAO ever promised, explicitly or implicitly, not to prosecute Gentile and, after doing so, should deny that portion of the motion as well.

Respectfully submitted,

PAUL FISHMAN
UNITED STATES ATTORNEY

By: s/ *Nicholas P. Grippo*
   _____
   Nicholas P. Grippo
   Paul A. Murphy
   Mark Coyne
   Assistant United States Attorneys

Dated:  September 23, 2016

52